PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 14-4754, 14-4804, 14-4812, 15-1344, 15-1739, 15-3765
_____

UNITED STATES OF AMERICA
v.
WILLIAM HIRD,
Appellant at No. 14-4754
_____

UNITED STATES OF AMERICA
v.
THOMASINE TYNES,
Appellant at No. 14-4804
_____

UNITED STATES OF AMERICA
v.
ROBERT MULGREW,
Appellant at No. 14-4812
_____

UNITED STATES OF AMERICA
v.
MICHAEL LOWRY,
Appellant at No. 15-1344

_____

UNITED STATES OF AMERICA
v.
WILLIE SINGLETARY,
            Appellant at No. 15-1739
_____

UNITED STATES OF AMERICA
v.
HENRY P. ALFANO,
aka Ed, aka Eddie,

            Henry P. Alfano,
            Appellant at No. 15-3765
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(District Court Criminal Nos. 2-13-cr-00039-007,
2-13-cr-00039-005, 2-13-cr-00039-003, 2-13-cr-00039-002,
2-13-cr-00039-004, 2-13-cr-00039-008)
District Judge:  Honorable Robert F. Kelly
District Judge:  Honorable Lawrence F. Stengel

Argued October 23, 2017

BEFORE:  GREENAWAY, JR., NYGAARD,
and FISHER, *Circuit Judges*


(Opinion Filed: January 18, 2019)

Angela Halim
Halim Drossner
1528 Walnut Street, Suite 1501
Philadelphia, PA 19102

Gregory J. Pagano
1315 Walnut Street, 12th Floor
Philadelphia, PA 19107
  *Counsel for Appellant in No. 14-4754*

Lisa A. Mathewson  [Argued]
123 South Broad Street, Suite 810
Philadelphia, PA 19109
  *Counsel for Appellant No. 14-4804*

Peter Goldberger  [Argued]
Pamela A. Wilk
50 Rittenhouse Place
Ardmore, PA 19003
  *Counsel for Appellant in No. 14-4812*

Michael J. Engle  [Argued]
Stradley Ronon Stevens & Young
2005 Market Street, Suite 2600
Philadelphia, PA 19103

Meredith A. Lowry
1528 Walnut Street, Suite 1501
Philadelphia, PA 19102
  *Counsel for Appellant in No. 15-1344*

William J. Brennan
1600 Locust Street
Philadelphia, PA 19103
        *Counsel for Appellant in No. 15-1739*

Mark E. Cedrone              [Argued]
Cedrone & Mancano
123 South Broad Street, Suite 810
Philadelphia, PA 19109
        *Counsel for Appellant in No. 15-3765*


Louis D. Lappen
Denise S. Wolf
Anthony J. Wzorek
Robert A. Zauzmer          [Argued]
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*


_____

OPINION OF THE COURT
_____

NYGAARD, *Circuit Judge.*

I.

In the run-up to a joint trial on a 77-count indictment that charged Appellants with operating a ticket-fixing scheme in the Philadelphia Traffic Court, the District Court denied a motion, under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), to dismiss charges of conspiracy (18 U.S.C. § 1349), mail fraud (18 U.S.C. § 1341), and wire fraud (18 U.S.C. § 1343). Appellants Henry Alfano (private citizen) and William Hird (Traffic Court administrator) subsequently pleaded guilty to all counts against them. But now they appeal the District Court's decision on this motion, questioning whether the indictment properly alleged offenses of mail fraud and wire fraud.[1]

Appellants Michael Lowry, Robert Mulgrew, and Thomasine Tynes (Traffic Court judges) proceeded to a joint trial and were acquitted on the fraud and conspiracy counts, but they were convicted of perjury for statements they made before the Grand Jury. Lowry, Mulgrew, and Tynes dispute the sufficiency of the evidence on which they were convicted by arguing that the prosecutor's questions were vague, and that their answers were literally true. Lowry and Mulgrew contend alternatively that the jury was prejudiced by evidence presented at trial on the fraud and conspiracy counts. Mulgrew also complains that the District Court erred by ruling that certain evidence was inadmissible.

At the same trial, the jury convicted Willie Singletary (Traffic Court judge) of making false statements during the investigation. He claims the District Court made errors when

---

[1] Alfano and Hird preserved their right to appeal. *See infra* subsection I.C.

it sentenced him.[2] The Government concurs with Singletary's challenge to his sentence.

We have consolidated these appeals for efficiency and have grouped the arguments—to the extent that it is possible—by common issues. We agree with Singletary and the Government that he should be resentenced. We will reverse the judgment and remand his cause to the District Court for this purpose. We are not persuaded by the rest of Appellants' arguments and will affirm their judgments of conviction.[3]

## II.

## Appellants Alfano[4] and Hird[5]

---

[2] Singletary also attempted to join additional arguments raised by other appellants, but for reasons we explain later, *see infra* note 33, we focus only on his challenge to his sentence.

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction to review these claims under 28 U.S.C.§ 1291 and 18 U.S.C. § 3742(a).

[4] Appellant Alfano pleaded guilty to Conspiracy (Count 1), Wire Fraud (Counts 2, 3, 4, 5, 6, 7) and Mail Fraud (Counts 51, 52, 53, 54, 55, 56).

[5] Appellant Hird pleaded guilty to Conspiracy (Count 1), Wire Fraud (Counts 3, 4, 5, 6, 16, 17, 18, 19, 20, 22, 23) and Mail Fraud (Counts 58, 59, 60).

A.

We begin with a brief look at the indictment's description of the Traffic Court and its operations to contextualize the arguments made by Alfano and Hird. The Philadelphia Traffic Court was part of the First Judicial District of Pennsylvania. App. 186 (Indictment ¶ 2).[6] It adjudicated violations of the Pennsylvania Motor Vehicle Code occurring in the City of Philadelphia, no matter whether the Philadelphia Police or the Pennsylvania State Police issued the tickets. App. 187 (Indictment ¶5). When a person was cited for a violation he or she was required—within ten days—to enter a plea of guilty or not guilty. If the person failed to plead, the Traffic Court issued a notice that his or her license was being suspended. App. 189 (Indictment ¶ 12). A person who pleaded not guilty proceeded to a hearing with a Traffic Court judge presiding. App. 187 (Indictment ¶ 6).

A guilty plea, or a determination of guilt by a Traffic Court judge after a hearing, resulted in a judgment ordering payment of statutory fines and court costs. App. 188 (Indictment ¶ 8).[7] The Traffic Court was responsible for collecting these fines (sending them to the City and

---

[6] Philadelphia Traffic Court was abolished and its jurisdiction was transferred to the Municipal Court in 2013 by an Act of the Pennsylvania General Assembly. 42 Pa.Con.Stat. §1121(a)(2) (2013). The court is now known as the Traffic Division of the Municipal Court.

[7] Although other penalties are prescribed by the Pennsylvania Motor Vehicle Code (App. 188), this appeal is limited to the monetary fines and costs. App. 355.

7

Commonwealth) and costs (which it distributed to several pre-designated funds). App. 188-89 (Indictment ¶ 9). Finally, it reported the disposition of each adjudication to the Pennsylvania Department of Transportation (PennDOT). App. 189 (Indictment ¶ 11).

B.

The indictment charged that, at the behest of Alfano (App. 193 (Indictment ¶ 25)) and others, the Traffic Court administrator and judges operated an "extra-judicial system, not sanctioned by the Pennsylvania court system" that ignored court procedure and gave preferential treatment ("consideration") to select individuals with connections to the court who had been cited for motor vehicle violations. App. 196 (Indictment ¶ 31). The special treatment included:

> (1) dismissing tickets outright; (2) finding the ticketholder not guilty after a "show" hearing; (3) adjudicating the ticket in a manner to reduce fines and avoid assignment of points to a driver's record; and (4) obtaining continuances of trial dates to "judge-shop," that is find a Traffic Court judge who would accede to a request for preferential treatment.

App. 195-196 (Indictment ¶ 30). All of this was "not available to the rest of the citizenry." App. 196 (Indictment ¶ 32). It also alleged that Appellants cooperated with each

8

other to fulfill requests they and their staffs received. App. 194-95 (Indictment ¶ 27). Finally, it charged that "[i]n acceding to requests for 'consideration,' defendants were depriving the City of Philadelphia and the Commonwealth of Pennsylvania of money which would have been properly due as fines and costs." App. 197 (Indictment ¶ 38).[8]

After extending consideration to favored individuals, Traffic Court judges would report the final adjudication to "various authorities, including PennDOT, as if there had been a fair and open review of the circumstances." App. 197 (Indictment ¶ 34). Appellant Hird provided a printout to Appellant Alfano showing citations that had been "dismissed or otherwise disposed of." App. 198-99 (Indictment ¶ 42). Such "receipts" were not routinely issued in cases.

## C.

Hird and Alfano pleaded guilty to all the charges against them in the indictment. But, in their plea agreement they reserved the right to appeal "whether the Indictment

---

[8] An example of the many allegations involving Alfano and Hird is: A.S. requested assistance from Appellant Alfano and Appellant Hird on Citation Number P1J0PK568L4 on or around February 17, 2010. The citation charged A.S. with driving a tractor-trailer from which snow and ice fell, striking vehicles on Interstate 95. The violation carried a $300 fine and costs of $142. Appellant Hird promised that he would "stop all action" on the citation and instructed A.S. to ignore the ticket. Although A.S. did not appear at the hearing, the Traffic Court judge (who is not an appellant here) ruled A.S. not guilty. App. 210-12 (Indictment ¶¶ 25-34).

sufficiently alleged that the defendants engaged in a scheme to defraud the Commonwealth of Pennsylvania and the City of Philadelphia of money in costs and fees." App. 355 (Plea Agreement ¶ 9(b)(4)). So they now appeal the District Court's order denying the motion to dismiss, asserting that the indictment failed to allege violations of mail fraud and wire fraud.

"To be sufficient, an indictment must allege that the defendant performed acts which, if proven, constitute a violation of the law that he is charged with violating." *United States v. Small*, 793 F.3d 350, 352 (3d Cir. 2015). We assume in our review that the allegations in the indictment are true. *United States v. Hedaithy*, 392 F.3d 580, 583 (3d Cir. 2004). "The question of whether the . . . indictments alleged facts that are within the ambit of the mail fraud statute is a question of statutory interpretation subject to plenary review." *Id.* at 590 n.10.

To indict on mail or wire fraud, the Government must allege that defendants "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and used mail or wire to effect the scheme. 18 U.S.C. §§ 1341, 1343. Alfano and Hird claim the Government failed to allege that the scheme to commit wire and mail fraud had an objective of "obtaining money or property." [9]

---

[9] In the context of mail fraud (§ 1341) and wire fraud (§1343) the term "money" has the same meaning. The same is true for the term "property." *Carpenter v. United States*, 484 U.S. 19, 25 n. 6 (1987).

10

The District Court ruled that the indictment sufficiently alleged that the scheme "involved defrauding the Commonwealth and the City of money." App. 20. It noted, among others, allegations that:

> The conspirators used the Philadelphia Traffic Court ("Traffic Court") to give preferential treatment to certain ticketholders, most commonly by "fixing" tickets for those with whom they were politically and socially connected. By doing so, the conspirators defrauded the Commonwealth of Pennsylvania and the City of Philadelphia of funds to which the Commonwealth and the City were entitled.

*Id.* at 18; *see also id.* at 185 (Indictment ¶ 1). Similarly, it referred to the following.

> In acceding to requests for "consideration," defendants were depriving the City of Philadelphia and the Commonwealth of Pennsylvania of money which would have been properly due as fines and costs.

11

*Id.* at 9; *see also id*. at 197 (quoting Indictment ¶ 38). Highlighting the references to "funds" and "money," and that the monetary amounts of the fines are specifically pleaded, the District Court cited to a case from the Court of Appeals for the Eighth Circuit which concluded succinctly that "[m]oney is money." *United States v. Sullivan*, No. 2:13-cr-00039, 2013 WL 3305217, at *7 (E.D. Pa. July 1, 2013) (quoting *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990)). The District Court was satisfied that the indictment alleged enough.

"Money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). But Alfano and Hird argue that the mere mention of money in an indictment is not enough. They point to a string of Supreme Court and Court of Appeals decisions analyzing Section 1341 and Section 1343 which reinforce the point that crimes of mail fraud and wire fraud are "limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987).[10] The Supreme Court said that "[a]ny benefit which the government derives from the [mail fraud] statute must be limited to the Government's interests *as a property holder*." *Id.* at 359 n.8 (emphasis added). Appellants are convinced that money in the form of traffic fines and costs cannot be regarded as the Government's "property" for purposes of mail or wire fraud, and they identify two decisions as particularly supportive of their position: *Cleveland v. United States*, 531

---

[10] The District Court cited to a number of cases that came after *McNally*: *Carpenter v. United States*, 484 U.S. 19 (1987); *Cleveland v. United States*, 531 U.S. 12 (2000); *Pasquantino v. United States*, 544 U.S. 349 (2005).

U.S. 12 (2000); and *United States v. Henry¸* 29 F.3d 112 (3d Cir. 1994).

The Court in *Cleveland* examined the mail fraud convictions of individuals who received a state video poker license by submitting a license application that withheld important information. *Cleveland*, 531 U.S. 12.[11] The Court noted that the video poker licenses were part of a state program that was "purely regulatory." *Id.* at 22 (citation omitted).[12] It ruled that licenses are a "paradigmatic exercise[] of the States' traditional police powers." *Id*. at 23. The Court went on to say that the state's regulatory powers involving "intangible rights of allocation, exclusion, and control" (which are embodied in a license) are not interests that traditionally have been recognized as property. *Id.* Therefore, even though appellants may have obtained the license through deception, this was not mail fraud because the license—at least while still in the hands of the state—was not

---

[11] The licenses were part of a regulatory scheme that had as its purpose to increase public confidence in the honesty of gaming activities that are free of criminal involvement. *Cleveland*, 531 U.S. at 20–21 (quoting La. Rev. Stat. Ann. § 27:306(A)(1) (2000) (repealed 2012)).

[12] The Court rebuffed the Government's attempts to analogize licenses to other forms of property like patents and franchise rights. As for likening licenses to franchise rights, the Court observed that the Government did not enter the video poker business, but rather decided to "permit, regulate, and tax private operators of the games." *Id*. at 24.

property. *Id.* at 26-27. It was a purely administrative tool used to achieve regulatory objectives. *Id.* at 21.

The state responded to the Court's concerns by agreeing that the licenses served a regulatory purpose, but it directed attention to the revenue it received from fees collected for license applications and renewals, as well as device fees. *Id.* at 21-22. It argued that this revenue is a property interest. *Id.* The Court was not convinced:

> Tellingly, as to the character of Louisiana's stake in its video poker licenses, the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law. Indeed, there is no dispute that TSG paid the State of Louisiana its proper share of revenue, which totaled more than $1.2 million, between 1993 and 1995. If Cleveland defrauded the State of "property," *the nature of that property cannot be economic*.

*Id.* at 22 (emphasis added). It concluded that "[e]ven when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on

14

liquor." *Id.* at 23.[13] The money collected from application and processing fees was an integral part of the state regulatory program and it did not create any property interest. *See id.*

The purpose of the Pennsylvania Motor Vehicle Code is to "promote the safety of persons and property within the state." *Mauer v. Boardman*, 7 A.2d 466, 472 (Pa. 1939). Moreover, issuing traffic tickets is a crucial element in the enforcement of the Motor Vehicle Code: it is a quintessential exercise of state police power. Alfano and Hird conclude, much like *Cleveland,* that no property interest could arise from revenue generated from the state's exercise of its police power in the form of a traffic-ticket fine. They see nothing but a regulatory program here. But this ignores crucial aspects of the case before us that make it different.

Simply stated, fees charged to obtain a license cannot be equated with fines and costs that result from a traffic ticket. The license fee was imposed, adjusted, and collected solely by the state's exercise of its regulatory authority. In contrast, here the state's police power is exercised when a citation is issued, but this ticket merely establishes the summary violation with which the person is charged. Once a person has been charged, it is judicial power (not the state's police power) that is exercised to determine whether the

---

[13] *Cleveland* also held that Government-issued licenses have no intrinsic economic worth before they are given to applicants. *Id.* at 23.

15

person is guilty and, if guilty, to impose the fine and costs.[14] These fines and costs, although specified by the Motor Vehicle Code, cannot be cabined as a product of the state's regulatory authority. They are part and parcel of the judgment of the court. With this in mind, it is significant that the indictment does not focus on how the citations were issued (which would implicate police power), but rather alleges that the judicial process was rigged to produce only judgments that imposed lower fines—or most often—no fines and costs at all.[15]

But this raises a further question: can a criminal judgment held by the government ever be "property?" The Court in *Cleveland* offered a critique in its analysis of a

---

[14] The Traffic Court was not an administrative tribunal. Rather, it was part of the First Judicial District of Pennsylvania. App. 186 (Indictment ¶ 2). *See also supra* note 6 and accompanying text.

[15] On this point, it is noteworthy that the Supreme Court also said the following: "We resist . . . [any invitation] to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress. . . . '[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Cleveland*, 531 U.S. at 24-25 (quoting *Jones v. United States,* 529 U.S. 848, 858 (2000)). As we discuss later, the legal tradition of understanding judgments as property is long-established. Consequently, the concern about expanding the reach of federal fraud statutes to new classes of property that was present in the deliberation of state licenses in *Cleveland* is not at issue here.

different issue (whether licenses were analogous to patents) that is apropos to answering this question.

> [W]hile a patent holder may sell her patent, see 35 U.S.C. § 261 . . . "patents shall have the attributes of personal property" . . . the State may not sell its licensing authority. Instead of a patent holder's interest in an unlicensed patent, the better analogy is to the Federal Government's interest in an unissued patent. That interest, like the State's interest in licensing video poker operations, surely implicates the Government's role as sovereign, not as property holder.

*Cleveland*, 531 U.S. at 23–24. Fines imposed by judges are criminal penalties that "implicate[] the Government's role as sovereign." *Id. at* 24. Judgments ordering traffic fines and costs cannot be sold and, in the logic of *Cleveland*, would seem then to have no intrinsic *economic* value. Indeed, the penal (non-economic) nature of the fine is undeniable because the failure to pay a fine can result in the imposition of sentences of greater consequence, including imprisonment. *See* Pa. R. Crim. P. 706 cmt. But *Cleveland* is not the last word. As we will discuss below, a Supreme Court opinion issued five years later, *Pasquantino v. United States*, 544 U.S. 349 (2005), forecloses the defendants' argument.

17

Finally, we note a dissimilarity between this case and *Cleveland*, highlighted by the District Court, on the significance of the monetary interest that the Government associates with the fraud. The *Cleveland* Court regarded the licensing fees as integral to the regulatory effort and collateral to the matter at hand. The indictment there centered on the scheme to obtain liceneses, and did not even raise the licensing fees. *See Cleveland*, 531 U.S. at 22. Indeed, those charged with the fraud paid all the appropriate fees; there was no evidence that the government suffered any economic detriment. *Id.*

In contrast, the indictment here explicitly states that the scheme deprived the City and the Commonwealth of money, and it describes the object of the scheme as obviating judgments of guilt that imposed the fines and costs. Unlike *Cleveland*, the fines and costs play a central role in the scheme as alleged.

Alfano and Hird next focus on our decision in *Henry* to argue that the Government cannot claim to have a property right because the Government never had a legal claim to the fines and costs at any point in the scheme. In *Henry*, we examined convictions for wire fraud arising from a competitive bidding process among banks to receive deposits of a public agency's bridge tolls. *Henry v. United States*, 29 F.3d 112 (3d Cir. 1994). Appellants—public employees— were convicted of mail fraud for giving one bank confidential information about bids from other banks. *Id*. at 113. We identified several problems,[16] but Alfano and Hird highlight

---

[16] The Supreme Court had already made clear that "a government official's breach of his or her obligations to the

18

our observation in *Henry* that the object of the mail and wire fraud must be something to which the victim could claim a right of entitlement. *Id.* at 115 ("a grant of a right of exclusion") (citing *Carpenter*, 484 U.S. at 26-27)).[17] Indeed, we noted that a bank's property right to the tolls would attach only after the funds were deposited. *Id.* at 114. So the banks that lost the bidding process never had a basis to claim any legally recognized entitlement to the toll deposits.[18] *Id.* at 115. A fraud claim cannot rest on the bidders being cheated out of an *opportunity* to receive the deposits. For these reasons, we concluded that the indictment did not allege a scheme to obtain fraudulently someone's "property." *Id.* at 116.

Here, the Government alleged that the defendants "were depriving . . . Philadelphia and . . . Pennsylvania of money which would have been properly due as fines and costs" by making it possible for certain well-connected individuals to avoid a judgment of guilt that imposed an obligation to pay appropriate statutory fines. App. 197

---

public or an employee's breach of his or her obligations to an employer" did not fall within the scope of Section 1343. *Henry*, 29 F.3d at 114 (citing *Carpenter,* 484 U.S. at 25).

[17] To assess whether a particular claim is a legal entitlement, "we look to whether the law traditionally has recognized and enforced [the entitlement] as a property right." *Henry*, 29 F.3d at 115.

[18] They were, no doubt, robbed of a fair process, but we could not identify any legal tradition that recognized this deprivation as a property right. *Id*. at 115.

(Indictment ¶ 38). But Appellants stress that, like the deposits in *Henry*, the indictment here alleged an entitlement that does not yet exist because a person must be adjudicated (or plead) guilty before they must pay any fines or costs. None of the cases directly associated with Alfano and Hird resulted in a guilty judgment. As a result, they argue, the Government cannot claim here that it was cheated of an entitlement, because they were only fines and costs that the people *might* have owed *if* they had been found guilty.

The District Court said it well. Accepting this argument "would permit the alleged conspirators" to take advantage of their "unique position" in this case "to enter into a scheme to commit fraud and then hide behind the argument that the success of their fraud precludes prosecution under the 'money or property interest' requirement of the mail and wire fraud statutes." *Sullivan*, 2013 WL 3305217, at *7. Appellants cannot rest on the very object of their scheme (to work on behalf of favored individuals to obviate judgments of guilt and the imposition of fines and costs) as the basis to claim that there is no fraud. Indeed, the not-guilty judgments that Alfano and Hird worked to obtain through the extrajudicial system were alleged in the indictment as evidence of the scheme itself.

Even if some of the cases in the extra-judicial system would have been judged not guilty in a real adjudication it is (as the District Court correctly noted) the intent of the scheme, not the successful execution of it, that is the basis for criminal liability. *See Neder v. United States*, 527 U.S. 1, 25 (1999) (In the criminal context, the court focuses on the objective of the scheme rather than its actual outcome; what operatives intended to do, not whether they were successful in

20

doing it.); *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir.) ("Civilly of course the [mail fraud statute]would fail without proof of damage, but that has no application to criminal liability."), *cert. denied* 286 U.S. 554 (1932). The indictment generally alleges not just that Appellants operated a system that operated outside the bounds of Traffic Court procedures, but that it did so for the purpose of obviating judgments of guilt imposing fines and costs in those selected cases. *See, e.g.*, *supra* note 8. Moreover, we note that in one case not directly involving either Alfano or Hird, the indictment alleged that fines and costs were not just obviated, but were actually erased by an alleged co-conspirator traffic court judge who ignored the conviction, backdated a continuance, and "adjudicated" the person not-guilty. App. 228-29 (Indictment ¶¶ 108-113). This episode serves to highlight that the entire scheme was centered on keeping (or taking) judgments out of the hands of the Government to prevent the imposition of fines and costs. As a result, Appellants' reliance on our justice system's presumption of innocence as a basis to argue against the existence of a governmental property interest is a red herring that is properly disregarded here.

Accordingly, we conclude that the indictment's allegation that the scheme had an objective of depriving "Philadelphia and . . . Pennsylvania of money which *would have been properly due* as fines and costs" is not undermined by the lack of guilty verdicts. App. 197 (Indictment ¶38 (emphasis added)).

Alfano and Hird next highlight that, in *Henry*, our property interest analysis centered on "whether the law traditionally has recognized and enforced [the entitlement in

21

question] as a property right." 29 F.3d at 115. Appellants assert that traffic fines and costs typically have not been considered economic property and are unsupported by any legal tradition sufficient to ground charges of wire and mail fraud. As we have already noted we disagree with any conclusion that the fines and costs at issue have no intrinsic economic value. But we turn to another decision of the Supreme Court that came after *Cleveland* to address squarely whether jurisprudence supports our conclusion.

In 2005 the Supreme Court reviewed convictions arising from a scheme to smuggle large quantities of liquor from the United States into Canada, evading Canadian taxes. *See Pasquantino v. United States*, 544 U.S. 349, 353 (2005). The Court noted that the right to be paid has been routinely recognized as property, *id.* at 355–56,[19] observing that there is an equivalence between "money in hand and money legally due," *id.* at 356. Affirming the conviction, the Court said: "Had petitioners complied with this legal obligation, they would have paid money to Canada. Petitioners' tax evasion deprived Canada of that money, inflicting an economic injury no less than had they embezzled funds from the Canadian treasury." *Id.* It concluded that: "[t]he object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's 'property.'" *Id.* Under *Pasquantino*, then, traffic tickets (or more precisely, judgments arising from them) are considered an "entitlement to collect money from individuals,

---

[19] The Court cited 3 W. Blackstone, Commentaries on the Laws of England 153–155 (1768), which classified the right to sue on a debt as personal property.

22

the possession of which is 'something of value.'" 544 U.S. at 355 (quoting *McNally,* 483 U.S. at 358).[20] We conclude that a scheme to obviate judgments imposing fines, effectively preventing the government from holding and collecting on such judgments imposes an economic injury that is the equivalent of unlawfully taking money from fines paid out of the Government's accounts. *See id.* at 358.

Alfano and Hird focus, finally, on the role that a judge's discretion plays in the adjudication of a case, asserting that the uncertainty this creates about outcomes in any given case undermines any argument that a judgment in a Traffic Court case can be claimed as an entitlement to property. To the extent that this merely rephrases the issue of guilt or innocence on particular charges, we have already

---

[20] We also note that Pennsylvania law permits the government to remedy the nonpayment of fines and costs as an unpaid debt through civil process, enabling the government to become a judgment creditor. Pa. R. Crim. P. 706 cmt. ("Nothing in this rule [concerning criminal fines] is intended to abridge any rights the Commonwealth may have in a civil proceeding to collect a fine or costs."). Because of this, a separate legal tradition is implicated that recognizes the judgment itself as property. *See*, *e.g., Armada (Singapore) PTE Ltd. v. Amcol International Corp.*, 885 F.3d 1090, 1094 (7th Cir. 2018). This long, stable legal tradition of recognizing civil judgments for money as property supports the conclusion that the fines arising from judgments in traffic court cannot be regarded merely as implicating the act of a sovereign imposing a criminal penalty. They can be collected by civil process as a debt and are, thus, a property interest.

23

addressed it above. To the degree that it refers to a judge's discretion in sentencing, as the District Court noted, there is no such discretion here.[21] The Motor Vehicle Code imposes fines and costs for each violation, eliminating any judicial discretion in this regard.

D.

All of this leads us to conclude that the District Court did not err by denying the motion to dismiss. We conclude that, as alleged, this scheme had the objective of preventing the City of Philadelphia and the Commonwealth of Pennsylvania from possessing a lawful entitlement to collect money in the form of fines and costs—a property interest—from individuals who Alfano and Hird assisted. We will thus affirm the convictions of Appellants Alfano and Hird.

III.

Appellants Tynes, Lowry, and Mulgrew

A.

---

[21] We question, in general, the relevance of an entity's authority to relinquish a just entitlement or to forbear an obligation that an entitlement imposes upon another, as a basis to call into doubt the legitimacy of, or the very existence of the entitlement. *But see United States v. Mariani*, 90 F. Supp. 2d 574, 583 (M.D. Pa. 2000) (Discretionary civil fines and penalties "may be too speculative to constitute a valid property interest.") (internal citation omitted).

In 2011, the United States Attorney presented to the Grand Jury evidence arising from the Federal Bureau of Investigation's inquiry into the Traffic Court. Appellants Lowry, Mulgrew, and Tynes testified and the Government brought perjury charges against them for statements they made to the Grand Jury. After Hird and Alfano pleaded guilty, the rest of the Appellants went to trial. The jury acquitted Lowry, Mulgrew, and Tynes of all counts against them on wire fraud, mail fraud, and conspiracy. But it found them guilty of perjury. Tynes, Lowry, and Mulgrew challenge their convictions by raising similar legal arguments about the sufficiency of the evidence.

As with all challenges to the sufficiency of the evidence, we use a highly deferential standard of review. *See United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). We examine the record in a light most favorable to the prosecution, and will not disturb the verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McGee*, 763 F.3d 304, 316 (3d Cir. 2014) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Tynes, Lowry, and Mulgrew argue that the questions asked of them at trial were fatally vague and/or that their answers were truthful. As a result, they contend that these questions and answers are an inadequate basis for a perjury conviction.

A conviction for perjury before a grand jury requires the Government to prove that the defendant took an oath before the grand jury and then knowingly made a "false material declaration." 18 U.S.C. § 1623. But we recognized (in the context of a sentencing enhancement for perjury) that sometimes "confusion, mistake, or faulty memory" results in

inaccuracies that cannot be categorized as a "willful attempt to obstruct justice" under perjury statutes. *United States v. Miller*, 527 F.3d 54, 75 (3d Cir. 2008) (quoting U.S. Sentencing Guidelines Manual § 3C1.1 cmt. n.2 (U.S. Sentencing Comm'n 2003). So we do understand that "[p]recise questioning is imperative as a predicate for the offense of perjury." *Bronston v. United States*, 409 U.S. 352, 362 (1973).

Precision, however, is assessed in context. An examiner's line of questioning should, at a minimum, establish the factual basis grounding an accusation that an answer to a particular question is false. *Miller*, 527 F.3d at 78. So a perjury conviction is supported by the record "when the defendant's testimony 'can reasonably be inferred to be knowingly untruthful and intentionally misleading, even though the specific question to which the response is given may itself be imprecise.'" *United States v. Serafini*, 167 F.3d 812, 823 (3d Cir. 1999) (quoting *United States v. DeZarn*, 157 F.3d 1042, 1043 (6th Cir. 1998)).

Challenges to the clarity of a question are typically left to the jury, which has the responsibility of determining whether the defendant understood the question to be confusing or subject to many interpretations. *United States v. Slawik*, 548 F.2d 75, 86 (3d Cir. 1977). Moreover, consistent with our standard of review, we will not disturb a jury's determination that a response under oath constitutes perjury unless "it is 'entirely unreasonable to expect that the defendant understood the question posed to him.'" *Serafini*, 167 F.3d at 820 (quoting *United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987), *abrogated on other grounds by*

26

*United States v. Wells*, 519 U.S. 482 (1997)).[22] On appeal, we review every aspect of the record pertinent to both the question and answer to reach a conclusion about whether, in context, the witness understood the question well enough to give an answer that he or she knew to be false. *See Miller*, 527 F.3d at 78. Our review, however, is focused on glaring instances of vagueness or double-speak by the examiner at the time of questioning (rather than artful post-hoc interpretations of the questions) that—by the lights of any reasonable fact-finder—would mislead or confuse a witness into making a response that later becomes the basis of a perjury conviction. Questions that breach this threshold are "fundamentally ambiguous" and cannot legitimately ground a perjury conviction. *Id.* at 77.[23]

---

[22] The Court of Appeals for the Second Circuit underscored the high bar this establishes for appellants by noting that a fundamentally ambiguous question is "not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (quoting *United States v. Lattimore*, 127 F. Supp. 405, 410 (D. D.C.), *aff'd*, 232 F.2d. 334 (D.C. Cir. 1955)).

[23] The rule of fundamental ambiguity is intended to "preclude convictions that are grounded on little more than surmise or conjecture, and . . . prevent witnesses . . . from unfairly bearing the risks associated with the inadequacies of their examiners." *Ryan*, 828 F.2d at 1015.

That is the law applicable to the claims raised by Tynes, Lowry and Mulgrew. But, because our review is fact-dependent, and because each raises some unique issues, we will address each of their claims individually.[24]

B.

---

[24] Adopting the arguments made by Alfano and Hird, Appellants Lowry, Mulgrew and Tynes assert that the Government improperly charged them with conspiracy, wire fraud, and mail fraud. Therefore, they assert, their joint trial on these counts of the indictment prejudiced the jury's deliberation on the charges of perjury. They claim such evidence would have been excluded under Federal Rule of Evidence. 403. They also contend that, without a charge of conspiracy, the joinder of their cases would have been impermissible under Federal Rule of Criminal Evidence 8(b) or, at the very least, severance of their cases would have been warranted under Federal Rule of Criminal Procedure 14(a). Certainly, where there is evidence of prejudice resulting from "spillover" evidence from counts that should have been dismissed, reversal is warranted. *See United States v. Wright*, 665 F.3d 560, 575-577 (3d Cir. 2012). But we have concluded that the District Court did not err by denying the motion, under Federal Rule of Civil Procedure 12(b)(3), to dismiss the conspiracy, wire fraud and mail fraud counts of the indictment. Thus, Appellants' spillover argument has been nullified. Likewise, Appellants have no basis to claim that the Court unfairly prejudiced them by not granting separate trials.

Appellant Tynes[25]

Appellant Tynes claims her convictions for perjury at Count 71 and Count 72 lack sufficient evidence because she was responding to questions that were fundamentally ambiguous. The perjury charged at Count 71 arises from the following exchange.

> Q. In all the years you've been [at Traffic Court] have you ever been asked to give

[25] Tynes filed a separate motion to dismiss. App. 291-99. The record also contains Tynes' proposed order to join Sullivan's motion to dismiss. App. 290. However, Tynes' motion contains no such request. Moreover, the Government's response to the motions notes that Lowry and Mulgrew moved to join (without argument), and makes no mention of Tynes. The District Court's ruling on Tynes' motion to dismiss relates only to the arguments she made separately in her brief. As a result, we cannot consider Tynes' arguments on appeal that relate to those raised in Sullivan's motion. Moreover, since she failed to raise any of the arguments she made in her separate motion to dismiss, these arguments are waived. With that said, we will affirm the District Court's ruling on the Motion raised by Sullivan and joined by the five Appellants. Therefore, we need not address Tynes' assertion that the District Court's mishandled her joinder motion because it does not prejudice the outcome of her appeal.

> favorable treatment on a case to anybody?
>
> A. No, not favorable treatment. People basically know me. The lawyers know me. The court officers know me. I have been called a nononsense person because I'm just not that way. I take my position seriously, and the cards fall where they may.

App. 255, 5720.[26] Tynes contends that the Government pursued a novel theory here (applying federal fraud statutes to allegations of ticket fixing) and used the vague term "favorable treatment" to gloss over its uncertainty about what, ultimately, would constitute an illegal act. She points out that the term had not been used before in reference to this case and that the Government offered no explanation or definition of the term to alert Tynes to the intent of the question.

Also, from Tynes' perspective, every litigant appearing before a court seeks an outcome that is favorable, thus making "favorable treatment" a term that essentially referred to "how litigation works." She claims that its use amounted to a fishing expedition designed to capture unfairly

---

[26] We cite to the testimony quoted in the indictment and the Grand Jury that was used at trial. We note that there are some typographical inconsistencies between these sources and in those instances we have quoted the Grand Jury testimony.

the entirety of her conduct in the courtroom. She warns that this is precisely the type of "open-ended construction" in questioning that we found unacceptable in *Serafini*. 167 F.3d at 822.

Tynes makes a related argument against her perjury conviction for Count 72. That conviction is based on this exchange.

> Q. You've never taken action on a request?
>
> A. No.

App. 257, 5722. She maintains that the word "request" was presented to the jury as a follow-on to the question grounding Count 71, requiring a person to link the term "favorable treatment" and the word "request" to make sense of it. She argues that the Government took advantage of the ambiguity of "favorable treatment," forcing the jury to speculate that Tynes interpreted "request" as "favorable treatment." This reliance on "sequential referents" is, from her perspective, exactly what we criticized in *Serafini*. 167 F.3d at 821. But she misconstrues our holding.

In *Serafini*, the surrounding questions focused on a different topic. This bolstered appellant's argument in that case that the question on which the perjury conviction rested was fundamentally ambiguous. *Id.* The appellant said the multiplicity of topics in surrounding questions caused the jury to speculate improperly on how he understood the question at issue. We said: "The meaning of individual questions and answers is not determined by 'lifting a statement . . . out of its immediate context,' when it is that very context which fixes

the meaning of the question." *Serafini*, 167 F.3d at 821 (quoting *United States v. Tonelli*, 577 F.3d 194, 198 (3d Cir. 1978)). In the case of *Serafini*, the context made the confusing nature of the question apparent. The various topics in surrounding questions created sufficient ambiguity to undermine the conviction. *Id.*

Here, however, even though the terms used by the examiner changed, we conclude that the line of questioning—including both questions that ground Count 71 and 72—have an obvious, consistent focus.

> Q. In all the years you've been [at Traffic Court] have you ever been asked to give favorable treatment on a case to anybody?
>
> A. No, not favorable treatment. People basically know me. The lawyers know me. The court officers know me. I have been called a nononsense person because I'm just not that way. I take my position seriously and the cards fall where they may. Most of the time . . . the people in my Court plea bargain. They know that most of the time,

ninety percent of the time, say 90 percent, I go with the police officer's recommendation. . . .

Q.      So, in all those years no one has ever asked you to find somebody not guilty--

A.      No.

Q.      --or to find a lesser violation; find a lesser fine; anything along those lines?

A.      No. I will say to people go to court, go to trial and see what happens. . . .

Q.      Ward leaders, politicians has anyone called you and said I have Johnny Jones coming up next week and I would appreciate it if -- if you would look favorably on him when he comes through? Has anything like that ever happened?

A.     Throughout     the years ward leaders and people have called all the time   and   asked   me questions. The only thing I will say to them is they need to go to court. If you think it's a problem, they need to hire a lawyer, or make sure you bring all your evidence to court. If it's     something     like inspection, make sure you bring your -- papers and things   like   that.   That's what I would tell them to do. I  give  advice     that way. I don't know if that's wrong or not, but I do.

Q.     You've never taken action on a request?

A.     No.

App. 528-29, 530; 5720-22.  This broader context would give any  reasonable  fact-finder  more  than  enough  basis  to conclude that the witness knew the point of reference for both the term "favorable treatment" and "request" was ticket fixing.  In fact, Tynes is asking us to do precisely the thing we criticized in *Serafini*, to lift a phrase or statement out of its context.  *Serafini*, 167 F.3d at 821.  Tynes has not persuaded us that the question harbors any fatal ambiguity.

34

Tynes next contends that her responses to questions grounding Count 71 and Count 72 cannot support convictions for perjury because they were literally true. Of course, perjury arises only from making knowingly false material declarations. 18 U.S.C. § 1623. Therefore, a witness who answers an ambiguous question with a non-responsive answer that the witness believes is true—even if the answer is misleading—does not commit perjury. *See Bronston*, 409 U.S. at 361-62; *see also United States v. Reilly*, 33 F.3d 1396, 1416 (3d Cir. 1994).

Tynes argues that, because she regarded the question about favorable treatment as vague, she interpreted it as asking whether she accepted any bribes in exchange for a judgment of not guilty or a reduced punishment. Her response of "no" (grounding Count 71) is literally true—she says—because there is no evidence that she accepted any bribes in return for giving preferential outcomes in the adjudication of some individuals who were cited for breaking the law. Under this theory, the same argument can also negate the charges at Count 72 since she says she did not accept any "requests" (bribes) in exchange for preferential treatment.

Although the jury is permitted reasonable inferences drawn from the record about the witness' understanding of the truth or falsity of the answer, it is not (as we noted above) permitted to reach conclusions based merely on speculation or conjecture. *See Bronston*, 409 U.S. at 359. Tynes' assertion of literal truth is undermined because the trial record supports no reasonable inference that the Government was asking her about matters outside of the alleged bribes, nor

35

does it provide any reason why Tynes would interpret the question in this way.

Finally, Tynes contends that the evidence was not sufficient to support her conviction. However, the jury heard Tynes' personal assistant, Medaglia "Dolly" Warren, testify that she received from personal assistants of other judges three to four cards per week requesting consideration. Each card had the name of a person who was appearing before Tynes on that day. She passed these to Tynes' court officer, who was present during the proceedings. App. 4593-95. Tynes also instructed Warren to give similar cards to the staff of other judges. App. 4598. Warren knew to act discreetly when she was transferring the cards. App. 4599. The jury also heard testimony from those who actually received consideration from Tynes. For example, Timothy Blong was cited for reckless driving and driving without a license. He admitted in testimony that he did not have a license when he was cited. App. 3150. He also testified that he requested consideration through a Traffic Court employee (Danielle Czerniakowski, who worked as a personal assistant to a Traffic Court judge) with whom he was acquainted. When he appeared in court, he was simply told that his case was dismissed. He did not have to say anything, App. 3159-60. Blong testified he was told his case was dismissed because the police officer did not appear (App. 3160-61), but the government produced evidence that an officer was present. App. 3193-96. The Government also showed that Tynes was the presiding judge in Blong's case. App. 3193. Richard Carrigan—who admitted in testimony that he drove through a red light—described a similar experience in which, after requesting favorable treatment through Judge Lowry's personal assistant, Kevin O'Donnell, his case was dismissed

36

by Judge Tynes without ever having to say a word. App. 3178-82.

Tynes does not challenge any of this in her appeal. Instead she focuses on the weight of other evidence and perceived gaps in testimony. We conclude that all of this provides more than a sufficient basis to support a reasonable jury's conclusion that Tynes did "give favorable treatment on a case," and did "take[] action on a request." App. 528-30.

For all of these reasons, we will affirm the judgment of conviction on perjury as to Appellant Tynes.

C.

Appellant Lowry[27]

Like Tynes, Appellant Lowry advances arguments of fundamental ambiguity and literal truth. His perjury conviction centered on one question and answer.

> Q. So if I understand your testimony, you're saying you don't give out special favors; is that right?
>
> A. No, I treat everybody in that courtroom the same.

---

[27] Lowry was charged with perjury in Count 69 of the indictment.

App. 489. Lowry attacks the Government's use of the term "special favors" as one with many potential meanings. However, as we noted above in our reference to *Serafini*, we reject arguments that lift individual questions or answers—or individual phrases embedded in either—from the context of surrounding questions that help fix their meaning. *Serafini*, 167 F.3d at 821. The larger context for the question asked of Lowry is as follows.

> Q. So if I understand your testimony, you're saying you don't give out special favors; is that right?
>
> A. Well, I know it appears that way; and it's hard for me to prove to you . . .
>
> Q. I'm just asking, your testimony is you don't give out special favors, is that right?
>
> A. No, I treat everybody in that courtroom the same.
>
> Q. You treat everybody fairly?
>
> A. I'm a lenient judge. I will admit to that.

Q. You treat everybody fairly?

A. Yes, I do.

Q. And these notices that you get from your personal or from other people, they don't affect you in any way; is that right?

A. Virtually no effect at all.

App. 489-90.

Lowry's assertion that the phrase "special favors" is subject to many interpretations is unconvincing. We note two things. First, the line of questioning reasonably supports a conclusion that this inquiry referenced conduct associated with allegations of ticket fixing. Second, Lowry answered as if his understanding of the question was consistent with this interpretation. He said that he was aware it may "appear" that he gave special favors. He also defended himself by saying that such requests did not affect his conduct in the courtroom at all. If—as he says—he understood "special favors" to mean fair treatment, his answer makes no sense.

Lowry next claims that, since the question was structured to elicit a negative response, his answer cannot be

39

used as the basis of a perjury charge. Relatedly, he contends that the question was merely a summation of an answer that he gave just before this question. In essence he argues that this was a leading question. We have concluded, in the context of a trial, that the propriety of leading questions in direct examinations is a matter left to the sound discretion of the trial judge. *See United States v. Montgomery*, 126 F.2d 151, 153 (3d Cir. 1942). We extend the same deference here to the District Court's decision to admit this portion of the Grand Jury transcript. We do not regard the question as fundamentally unfair or unclear, or something outside the norm of questions typically employed on direct examination. For these reasons, we conclude that the District Court did not abuse its discretion here.

Alternatively, Lowry argues that—if the term is understood to reference fixing tickets—there is no evidence to contradict his response that requests for special favors did not impact any of his adjudications. We do not agree. The record contains the following testimony.

Kevin O'Donnell, who was Lowry's personal assistant, testified about Lowry's involvement with requesting and giving consideration. He said that Lowry made four to five requests each month for consideration and that O'Donnell transmitted them to the personal assistants of other Traffic Court judges. App. 1854. Likewise, he said other judges transmitted requests for consideration to Lowry through their personal assistants. App. 1812-13. Appellant Hird and various politicians also made requests of Lowry for consideration. App. 1827-28, 1832-33. O'Donnell said he would give the requests to Lowry on the day scheduled for hearing on the citation. App. 1818-19. The requests were for

40

preferential treatment in the adjudication of particular citations: typically the requests were for "removing points" and obtaining a "not guilty" judgment. App. 1819. O'Donnell said he sometimes had to signal Lowry in the courtroom to remind him that a particular case was supposed to receive consideration. App. 1822-23. He testified from his own observation that Lowry typically honored requests for consideration. App. 1829. He also declared if Lowry claimed he never gave consideration or asked it of others, this would not be truthful. App. 1813. The same assistant testified that if Lowry testified that he ignored requests for consideration, or that he never honored requests for consideration, that testimony would not be true. App. 1855. The Government also asked: "If [Lowry] claimed that . . . consideration requests had no impact when he disposed of cases, would that be true?" The assistant responded, "probably not." *Id.*

Another witness, Walt Smaczylo, employed as a court officer in the Traffic Court, provided an example of how "consideration" worked in the courtroom.

> When someone comes in, for example, for a reckless driving ticket and that judge normally comes down pretty hard and finds that defendant guilty and then the same type cases come in and you see a defendant walk out either not guilty or a significantly reduced charge.

App. 1912. The Government asked Smaczylo if he saw Lowry preside over such instances, and he answered: "That's correct, yes." *Id.* Smaczylo testified that requests for consideration were written on small note cards or "sticky" notes and that he saw Lowry in possession of these cards and notes. App. 1914. He also provided a generalized example of consideration, based on his observation and understanding, in which a reckless driving citation would be reduced to careless driving. In such instances, he indicated that a $300 to $400 fine would be cut in half. He said: "So, that money was not collected, obviously, by the state. If that ticket was fixed then I saw it as stealing." App. 1919. Smaczylo was asked: "[I]f Judge Lowry testified at the [G]rand [J]ury he didn't give consideration would that be a truth or would that be a lie?" He responded: "That would not be the truth." App. 1921.

All of this testimony provides more than a sufficient basis to support a reasonable jury's conclusion that Lowry was not truthful when he responded to the Government's question about special favors. [28]

---

[28] Lowry points to the cross-examination of both witnesses in which they seem to equivocate on some of their observations and responses to the Government. For instance O'Donnell stated his view that giving consideration was no different from the leniency that Lowry extended to every other person who pleaded not guilty and appeared at the hearing. However, we do not weigh the credibility of evidence in the record. We only judge whether there is sufficient evidence in the record to support a reasonable fact-finder's determination that the record supported conviction of Lowry on a charge of

Finally, Lowry argues that the Government's question sought a dispositive response from him on the charges of conspiracy and fraud. He says an affirmative answer to whether he gave "special favors" to certain individuals would have been enough to convict him of conspiracy and fraud. Thus, he maintains that his acquittal on charges of mail fraud, wire fraud, and conspiracy is res judicata as to the perjury charges that are based on his answer. He said he did not commit fraud and the jury agreed with him. Therefore, he says, he did not perjure himself. However, even if we accepted Lowry's characterization of the question, we reject this argument.

First, a jury's determination that Lowry's ticket-fixing conduct did not constitute wire fraud, mail fraud, and conspiracy does not preclude its determination that he lied about this conduct before the Grand Jury. Moreover, as the Supreme Court has articulated, a verdict on one count that seems to be at odds with another "shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *United States v. Powell*, 469 U.S. 57, 63 (1984) (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932)). It is impossible to know in such cases whether the verdicts were an exercise of lenity by the jury or outright error.

Nonetheless, as the *Powell* Court noted, any assessment of the jury's rationale for its verdicts "would be

---

perjury. *See United States v. Richardson,* 658 F.3d 333, 337 (3d Cir. 2011).

based either on pure speculation or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.* at 58. So, even if Lowry was correct that the acquittal is relevant to his response to the question grounding his perjury conviction, we are not convinced that his perjury conviction is unfounded. Given the substantial body of evidence presented to the jury, nothing here demands that we abandon the deference we traditionally give to the collective judgment of the jury. For all these reasons, we will affirm the jury's verdict as to Lowry.

D.

Appellant Mulgrew[29]

Mulgrew does not argue that the question asked at the Grand Jury was ambiguous, he simply maintains that his statement was truthful.[30] The questions and answers grounding his perjury conviction are as follows.

> Q. How about your personal, has your personal received any calls like that from other judges, other ward leaders that she's conveyed to you, saying

---

[29] Mulgrew was charged with perjury in Count 70 of the indictment.

[30] Mulgrew's claims are reviewed for plain error because he did not make the same argument before the District Court. *United States v. Syme*, 276 F.3d 131, 148 (3d Cir. 2002).

so-and-so has called about this case?

A.     If she did, she didn't convey them to me.

App. 432-33 (emphasis added).   Shortly after this, the following exchange occurred:

Q.     Let me make sure as well that if I got your testimony correct [sic]. You're saying that if other people, whether they be political leaders, friends and family, anybody is approaching your personal and asking her specifically to look out for a case, see what she can do in a case, give preferential treatment, however you want to phrase it, that she is not relaying any of that information on to you; is that correct?

A.     No, she isn't.

App. 438.  As to the first exchange, Mulgrew claims that the Government's use of the word "call" referred exclusively to telephone calls.  This mattered to him, he says, because others

45

had testified that personal assistants of other Traffic Court judges would give index cards to his personal assistant in his chambers or robing room containing names of some individuals whose tickets were listed for hearing. Mulgrew claims that there is no evidence that he ever received any phone calls asking that he act extrajudicially to give well-connected individuals preferential treatment. The implication is that, had the Government asked him about receiving index cards with such requests, his answer would have been completely different.

As with Tynes and Lowry, our review of claims of literal truth drives us to examine the context of the question.

> Q. How about other judges, have other judges ever approached you or called to you or get a message to you either themselves or through their personals saying that someone is going to be on your list next week or next Monday and can you could some special way towards the case?
>
> A. No, they haven't.
>
> Q. Never?
>
> A. No.

46

Q.    How about your personal, has your personal received any *calls* like that from other judges, other ward leaders that she's conveyed to you saying so and so has called about this case?

A.    If she did, she didn't convey them to me.

Q.    And your personal is who?

A.    Gloria McNasby.

Q.    Have you ever seen on traffic court files --You actually get a file when someone's case is called?

A.    Right.

Q.    So the case is called and you get a file presented to you; is that right?

A.    uh-huh.

Q.    Have you ever seen any index cards or notations on the file

47

> indicating that a person *has called* or taken some special interest in this case?
>
> A.     Nope.

App. 432-33 (emphasis added). The transcript makes it obvious that Mulgrew's singular reliance on the reference to a "call" ignores the thrust of the Government's line of questions. The questions focus on the substance of the communications between Mulgrew's personal assistant and himself, rather than the mode of those communications.

Mulgrew also claims that he responded truthfully to the second question.

> Q.     Let me make sure as well that if I got your testimony correct [sic]. You're saying that if other people whether they be political leaders, friends and family, anybody is approaching your personal and asking her specifically to look out for a case, *see what she can do* in a case, give preferential treatment, however you want to phrase it, that she is not relaying any of that

information on to you; is
that correct?

A.      No, she isn't.

Q.      Wouldn't you want
to know it?

A.      No, I don't want to
know. Then I never have to
worry about what I do in
the courtroom.

App. 437-38 (emphasis added). Apparently focusing on the words "see what she can do," he says that he answered truthfully by responding that his personal assistant did not tell him that people were approaching her and asking *her* to give them preferential treatment. But, as with the first question, Mulgrew cherry-picks a small part of the question out of context, distorting it. The full text and follow up question show that the thrust of the inquiry was whether Mulgrew's personal assistant was informing him of the names of those requesting preferential treatment from him. And Mulgrew's response to the follow-up question —saying that he did not want to know so that he did not have to worry about what he did in the courtroom—is consistent with one who understood this. App. 438.

We conclude that, ultimately, the evidence is sufficient for a reasonable jury to conclude Mulgrew understood that both of these questions were focused on whether his personal assistant informed him of requests for him to give preferential treatment, and that he answered in the negative to both.

Mulgrew alternatively asserts that the District Court erred by refusing to admit additional testimony from the Grand Jury that he claims is relevant to his perjury conviction.[31]   After the Government introduced Mulgrew's Grand Jury testimony, Mulgrew sought the admission of other portions of his testimony.  But the District Court sustained the Government's hearsay objection.   The portion of the transcript supporting the perjury conviction is as follows:

> Q.    [W]hether you have ever been asked to provide, what I'll call, favorable treatment for people in traffic court or however you define that, whether it would be special handling, keep an eye out for a ticket, do me a favor. Have you ever been asked to provide any type of treatment like that for people in traffic court?
>
> A.    People have asked me for consideration, but I give consideration to everybody that comes in my courtroom[,]   so   it

---

[31] We review the District Court's ruling on the admissibility of evidence for abuse of discretion. *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010).

>doesn't make a difference
>to me.

App. 422-23.  The basis for the Government's hearsay objection to this portion of the testimony was that it raised an out-of-court statement not offered by a party opponent.

Mulgrew first contends that the District Court erred by ruling that this was hearsay because it was not offered for the truth of the matter asserted.  He says that the testimony was instead offered to show his state of mind later in his testimony.  *See United States v. Hoffecker*, 530 F.3d 137, 191-92 (3d Cir. 2008).  However, we conclude that it was not an abuse of discretion for the District Court to sustain the Government's hearsay objection.  It was reasonable for the District Court to conclude here that his response relied on out-of-court statements offered to assert his innocence since his response conveys a declaration that he treated no person different from another.

Mulgrew also argues that this portion of the transcript is admissible under Federal Rule of Evidence 106:  "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement— that in fairness ought to be considered at the same time."  Mulgrew maintains that this question and answer provides context showing that he did not commit perjury.  He also maintains that the "doctrine of completeness" applies here: fairness demanded the admission of the statements.  *See*

*United States v. Soures*, 736 F.2d 87, 91 (3d Cir. 1984).[32]  We are not convinced.

The excerpt at issue occurs many pages before the testimony regarded as perjurious.  It is unrelated in the overall sequence of questions and to the answers grounding his conviction.  Moreover, as the intervening pages suggest, it was separated by the passage of time during questioning.  We also fail to see how Mulgrew's equivocation over the term "consideration" gives helpful context to his later denial of receiving requests for consideration.  For these reasons, we conclude the District Court did not abuse its discretion by sustaining the Government's hearsay objection.

IV.

Appellant Singletary[33]

---

[32] "Under this doctrine of completeness, a second writing may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding."  *Soures*, 736 F.2d at 91.

[33] Appellant Singletary was charged with making false statements in Counts 73 and 74 of the indictment.  He states in his brief that he 'joins all arguments on behalf of co-appellants pursuant to Federal Rules of Appellate Procedure 28(i)."  Singletary Br. 19.  To the extent that he joins the argument of prejudice resulting from the trial on the fraud and conspiracy charges, we already have determined that the indictment was proper and no prejudice resulted from

During the investigation of the Traffic Court by the Federal Bureau of Investigation, Appellant Singletary was among those interviewed. The jury acquitted Singletary of all counts of wire fraud, mail fraud, and conspiracy. It found him guilty of false statements made to the Federal Bureau of Investigation. At sentencing, over Singletary's objection, the District Court sentenced Singletary using the Guideline on obstruction.

The Government agrees that the single count on which he was convicted does not contain all of the elements of obstruction. U.S.S.G. § 2J1.2. For this reason, the Government agrees with Singletary that he is entitled to a remand for resentencing. Accordingly, we will vacate the judgment of sentence as to Singletary and remand to the District Court for resentencing.

V.

For all of these reasons, we will vacate the judgment of sentence of the District Court with regard to Appellant Singletary and remand for resentencing. We will affirm the judgments of the District Court as to Appellants Alfano, Hird, Lowry, Mulgrew and Tynes.

---

bringing these charges to trial. As for the challenges to perjury in Counts 72 and 74, we note that Singletary was charged with a different crime: false statements in a federal investigation pursuant to 18 U.S.C. § 1001. In addition, the challenges to all of such charges are inherently fact-intensive. As he did not provide a factual basis for such a challenge, we regard the issue to be waived.