**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1981

_____

UNITED STATES OF AMERICA

v.

MOHAMMED JABATEH
a/k/a Jungle Jabbah

Mohammed Jabateh,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-16-cr-00088-001)
District Judge: Hon. Paul S. Diamond

_____

Argued January 21, 2020

Before: AMBRO, MATEY, FUENTES, *Circuit Judges*.

(Filed: September 8, 2020)

Peter Goldberger  (Argued)
50 Rittenhouse Place
Ardmore, PA 19003
    *Counsel for Appellant*

William M. McSwain
Nelson S.T. Thayer, Jr.
Linwood C. Wright, Jr.
Robert A. Zauzmer  (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
    *Counsel for Appellee*

_____

OPINION
_____


MATEY, *Circuit Judge*.

Mohammed Jabateh served as a rebel commander during the Liberian civil war. When his faction lost power, he fled to the United States seeking asylum and permanent residency. His conduct in Liberia, characterized by brazen violence and wanton atrocities, made an honest immigration application impossible. So he repeatedly lied to United States immigration officials, concealing his crimes and portraying himself as a persecuted victim. Jabateh's ruse succeeded for almost twenty years until a jury convicted him of immigration fraud and perjury. Now, Jabateh challenges his conviction and his sentence. His arguments about the quantity and quality of evidence presented at trial are wrong, with plentiful facts

supporting the jury's findings. And his claims of sentencing error ignore the careful and detailed reasoning of the District Court.

Jabateh also argues, for the first time, that the Government improperly charged him with making false oral statements during an interview with an immigration officer in violation of 18 U.S.C. § 1621 and 18 U.S.C. § 1546(a). While we find no error in Jabateh's convictions for perjury under § 1621, his convictions under § 1546(a) are a different matter. In every case, of course, "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." *United States v. Gaudin*, 515 U.S. 506, 522–23 (1995). The statutory text alone defines those elements. Here, the text of § 1546(a) criminalizes fraud in immigration documents. By contrast, the Government did not charge Jabateh with fraud *in* his immigration documents, only with orally lying *about* those documents. That is a distinction unsupported by the ordinary and best reading of § 1546(a), and we agree with Jabateh that the Government's interpretation is incorrect.

But while Jabateh is right, his failure to raise this argument at trial significantly alters the scope of our review. Given the novelty of the interpretative question, and the lack of persuasive, let alone authoritative, guidance, we cannot conclude that our reading of § 1546(a) meets the stringent standards for reversal for "plain error" the Federal Rules of Criminal Procedure require. For that reason, we will affirm his conviction in full.

## I. BACKGROUND

We recount only the relevant history, reviewing the record evidence in the light most favorable to the prosecution, as we must in an appeal challenging the sufficiency of the evidence. *United States v. Caraballo–Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc).

### A. Jabateh and the Liberian Civil War

Civil war brought brutal violence to Liberia. In 1989, Charles Taylor's rebel group, the National Patriotic Front of Liberia (NPFL), invaded Liberia to overthrow Liberia's president, Samuel Doe. The violence fractured not only Liberia but the rebels themselves. NPFL soon split into two factions: the NPFL led by Taylor, and the Independent National Patriotic Front of Liberia (INPFL) led by Prince Johnson.[1] In 1990, Johnson captured and executed President Doe, triggering even more violence.[2] New rebel factions entered the fray to oppose the NPFL, including the United Liberation Movement of Liberia (ULIMO), founded by ethnic Mandingos and Krahns, groups targeted by the NPFL.[3] Tensions within ULIMO eventually swelled, causing a split along ethno-religious lines into new warring factions. Islamic Mandingo fighters followed Alhaji Kromah, a member of former President Doe's cabinet, to form ULIMO-K (for

---

[1] Luca Renda, *Ending Civil Wars: The Case of Liberia*, 23-Fall Fletcher F. World Aff. 59, 61 (1999).

[2] *Id.*

[3] *Id.* at 62 & n.11.

4

Kromah), while Christian Krahn fighters joined Roosevelt Johnson to form ULIMO-J (for Johnson).[4]

One of Kromah's ULIMO commanders was Mohammed Jabateh, who fought under the *nom de guerre* "General Jungle Jabbah" or "Jungle Jabbah."[5] During the height of the civil war, from 1992 through 1995, Jabateh led ULIMO's Zebra Battalion at the frontlines of the conflict in Western Liberia. Under Jabateh's command, fighters brutalized prisoners of war and civilians alike. Their crimes were breathtaking in their scope and cruelty, including murder, rape, torture, ritual cannibalism, and human enslavement. We recount only some of the atrocities told at trial to the extent relevant to the issues raised on appeal.

1.     Torture

Jabateh and fighters acting under his direction routinely tortured and murdered their adversaries, real or assumed. Operating from a territory dubbed "Zero Guard Post,"[6] Jabateh's militia arrested and then executed anyone suspected of "reconnaissance." (App. at 677.)  Their bodies were then simply "throw[n] . . . into the river." (App. at 678.) Others were less fortunate, suffering torture before death. A favorite practice of Jabateh's troops involved "*tabay*," binding a prisoner's arms behind the back tight enough to constrict breathing. In one instance, Jabateh ordered a child soldier to

---

[4] *Id.*

[5] Three witnesses at trial identified Jabateh in the courtroom as the ULIMO Commander known as Jungle Jabbah.

[6] A less than subtle reference, as "[z]ero means [']to get rid of you['] in the Liberian language." (App. at 675.)

5

place tires around two prisoners' necks, douse the tires in gasoline, and set them on fire. As the prisoners screamed in agony, Jabateh's fighters shot them, then left their bodies to burn to ashes.

In another instance, Janghai Barclay testified that she fled her home to escape fighting between ULIMO and NPFL, only to endure capture by Jabateh's men. When Jabateh arrived to inspect the prisoners, Ms. Barclay watched Jabateh declare a captured young man a spy and order him executed. Jabateh's soldiers tied the man to a tree and slit his throat. Jabateh then told his soldiers that they could "take" the women for themselves and "[w]hen they refuse you can kill them." (App. at 1040.) The soldiers then raped Ms. Barclay, who was eight months pregnant, causing her to suffer a miscarriage.

Or take Hawa Gonoie. She recounted that she was just thirteen when Jabateh and his fighters came to her village. After Jabateh's forces captured her family, she witnessed Jabateh give the order to kill a suspected spy, remove his heart, and feed the organ to Jabateh and his fighters. Conscription into ULIMO-K awaited the men, while Jabateh ordered his soldiers to "have" the women. (App. at 408.) Jabateh "assigned" Ms. Gonoie to an adult soldier who raped her for the next month and a half. (App. at 412.)

2.      Persecution

The violence rolled on. After ULIMO split along tribal lines, Jabateh and his ULIMO-K fighters targeted, tortured, and killed members of the Krahn tribe. Around this time, ULIMO-K troops attacked a village where Martha Togba lived with her sister Tina. During the attack, troops targeted Tina because she was the girlfriend of a ULIMO-J commander.

6

Jabateh dragged a pregnant Tina from her home by her hair, bleeding from a gunshot wound and half naked, into the street. Jabateh beat and stabbed Tina while he interrogated her about her boyfriend's location. When Tina insisted that she did not know, Jabateh inserted his gun into Tina's vagina and fired, killing her. Jabateh then ordered a child soldier to guard Tina's body as it lay in the street to ensure that no one moved her until her body rotted.

### 3. Retribution

Jabateh quelled opposition with bone-chilling cruelty. When residents of one town complained to the Economic Community of West African States Monitoring Group ("ECOMOG") after ULIMO-K killed and beat several villagers and looted their homes, Jabateh and his troops returned to mete out punishment. Soldiers gathered the townspeople and pressed them into slavery. For little more than sport, Jabateh ordered several villagers, including the village chief, executed, and their hearts cut out. Grim acts of cannibalism followed.

The record goes on and on, but we will not. It is enough to say without exaggeration that the atrocities documented at trial, and found by a jury, paint a portrait of a madman.

## B. Jabateh Seeks Asylum

But though mad, Jabateh was no fool. So when the civil war ended with Taylor and the NPFL victorious, and a possible reckoning for his crimes loomed, Jabateh left Liberia and applied for asylum in the United States. As part of the application, Jabateh filed Form I-589 ("Asylum Application")

with the United States Immigration and Naturalization Service. One question on the Asylum Application asked:

> Have you or any member of your family ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?
>
> If yes, provide a detailed explanation of your or your relatives' involvement with each group and include the name of each organization or group; the dates of membership or affiliation; the purpose of the organization; your duties or your relatives' duties or responsibilities in the group or organization; and whether you or your relatives are still active in the group(s).

(App. at 93.) Jabateh responded "Yes" and referred to the attached personal statement. (App. at 93.) In addition, the Asylum Application asked:

> Have you, your spouse, or child(ren) ever caused harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion, or ever ordered, assisted, or otherwise participated in such acts?

(App. at 95.) In response to this question, Jabateh marked "No" on the form. (App. at 93.)

8

In the personal statement accompanying his asylum application, Jabateh spun a tale that reimagined his role during the war and diffidently cast himself as an innocent victim of ethnic persecution. He claimed he worked as an intelligence officer for ULIMO's predecessor, and was merely transferred into the successor organization. Jabateh painted ULIMO's cause as noble, hoping to "protect Mandingo and Krahn people from being murdered and massacred by NPFL forces and to bring democracy to Liberia[.]" (App. at 99.) But Jabateh never mentioned military combat. Instead, he explained his work as largely clerical and administrative, first inside the executive headquarters and later as part of the security detail for ULIMO's leader. Then, he explained, when ULIMO's opponents took office, Jabateh and his fellow Mandingo colleagues were dismissed. And fearing persecution, he fled to the United States. In short, fabrications and falsehoods filled his written statements.

In 1999, Jabateh met with Nancy Vanlue, a U.S. Citizenship and Immigration Services ("USCIS") asylum officer, for an interview about his application ("1999 Interview"). At the meeting, Vanlue reviewed Jabateh's written responses in his Asylum Application, and his accompanying personal statement. During the interview, Vanlue asked Jabateh to confirm his answers, including whether he had "ever committed a crime" or "harmed anyone else." (App. at 166, 570–71.) Jabateh was firm, responding "no." Accepting his sworn answers, Vanlue recommended Jabateh be granted asylum. Based on his application responses and Vanlue's recommendation, Jabateh was granted asylum.

## C.   Jabateh Seeks Permanent Residency

In 2001, Jabateh applied for permanent residency in the United States. As before, he filed a written application, this time using Form I-485. And once again, his answers ignored the truth. Among other questions, Form I-485 asked "[h]ave you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion?" and "have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S. or any immigration benefit?" (App. at 84.) Jabateh's answer to both: no.

Many years later, in 2011,[7] USCIS officer Norman De Moose interviewed Jabateh under oath about his application for permanent residency ("2011 Interview"). De Moose reviewed and confirmed Jabateh's responses in his Form I-485, but tailored the interview to focus on the questions "actually applicable" to Jabateh. (App. at 603, 628.) De Moose knew the Liberian civil war involved "a great number of atrocities" with "no clean hands on either side." (App. at 619.) So while Jabateh was still under oath, De Moose asked certain questions from Form I-485 verbatim. When he came to question 8 on Form I-485, De Moose asked Jabateh: "Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise

---

[7] Although Jabateh applied for permanent residency in 2001, his initial interview occurred in 2007, and another four years passed before his follow-up interview in 2011. The Government explains this delay as "just a lag in the immigration system." (Oral Arg. Tr. at 50–51.) The accuracy of that charitable characterization is beyond the scope of this appeal.

participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion?" (App. at 84, 635.) Jabateh responded "no." (App. at 635.) De Moose also asked question 10 verbatim, asking "have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S. or any immigration benefit?" (App. at 84, 637.) Jabateh again answered "no." (App. at 637.) These false answers were critical because, as De Moose explained, "somebody who takes up arms and engages in certain wartime acts would be inadmissible to the United States." (App. at 627.)

**D.    Jabateh is Indicted for Fraud**

Although the wheels of justice sometimes turn slowly, they do not turn without purpose. And so, nearly two decades after his arrival, a grand jury indicted Jabateh for the fraud in his immigration documents in violation of 18 U.S.C. § 1546(a) (Counts One and Two) and perjury in violation of 18 U.S.C. § 1621 (Counts Three and Four).[8] But the long delay came with a cost: all four counts related to Jabateh's oral statements during the 2011 Interview. Recall that Jabateh filed his Form I-485 application for permanent residency in 2001, so the statute of limitations for any misconduct related to that filing had long passed by the time of Jabateh's indictment in 2016. *See* 18 U.S.C. § 3282 (five-year statute of limitations); 18 U.S.C. § 3291 (ten-year statute of limitations for certain immigration offenses). That left the Government with only Jabateh's oral responses in the 2011 Interview affirming his

---

[8] The Government explained that Jabateh was not indicted until 2016 because "[t]he information that proved the misconduct here did not come to the Government's attention until well after the 2011" Interview. (Oral Arg. Tr. at 50.)

11

answer of "no" to the questions related to genocide and prior misrepresentations during his immigration applications.

**E.    Jabateh's Conviction**

For those who suffered under Jabateh's command, the two-week jury trial provided a vivid public rebuke from seventeen Liberian eyewitnesses whose "demeanor and bearing . . . underscored the almost inconceivable horrors and indignities they had endured." (App. at 14.) The District Court observed that "[i]t is difficult to convey the force of the prosecution's trial evidence" (App. at 14), which established that Jabateh was a rebel commander during the Liberian civil war known as "Jungle Jabbah." And that evidence also demonstrated that, as a rebel commander, Jabateh personally committed or ordered his troops to commit murder, enslavement, rape, and torture "because of race, religion, nationality, ethnic origin or political opinion." (PSR ¶ 7.) Following deliberations, the jury convicted Jabateh on all four counts. The District Court later imposed a sentence of 360 months' imprisonment, the maximum permitted, along with three years' supervised release, and a special assessment of $400.[9] Jabateh timely appealed. The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

**II. ANALYSIS**

The horrors recounted at trial, retold only in part here, are indescribably tragic. Our role on appeal, however, is to review whether the prosecution carried its burden to prove

---

[9] The District Court separately issued a detailed memorandum outlining its reasoning for the sentence imposed.

beyond a reasonable doubt each element of the crimes charged. That the Government did on Counts Three and Four, establishing all the elements needed for the jury's finding of perjury under 18 U.S.C. § 1621. And while the text of 18 U.S.C. § 1546(a) cannot be read to reach the conduct charged by the Government in Counts One and Two, that error is not plain. Finally, there are no sufficiency or sentencing errors that warrant reversal. So we will affirm.

## A.    18 U.S.C. § 1546(a) Does Not Encompass Oral Statements

We begin with the charges in Counts One and Two alleging that during the 2011 Interview, and while under oath, Jabateh orally reaffirmed false answers on his permanent resident application.[10] Both counts alleged that these false, oral statements violated 18 U.S.C. § 1546(a) which prohibits a particular kind of conduct where a person:

> knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed

---

[10] To repeat, that Jabateh had never "engaged in genocide, otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion" (Count One), and that he had never procured an immigration benefit by fraud or willful misrepresentation of a material fact (Count Two). (App. at 75–76.)

13

thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact. . . .

The Government and Jabateh agree on this much: all that is at issue is whether § 1546(a) is best read to reach Jabateh's oral statements during the 2011 Interview. Deciding that question turns not on Jabateh's butchery and debasement of innocents illustrated to, and found by, a jury of his peers. Rather, no matter how troubling the facts, perhaps, especially when so, "our job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (alteration in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *see also New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process[.]" *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). Such a result would, of course, "deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Id.* And "the people" protected by our system of laws include both the innocent and the guilty. So to interpret the meaning of § 1546(a) in its current form, we begin with the text as originally enacted and

14

then consider the import of amendments to that text over time.[11]

### 1. The Immigration Act of 1924

The law codified as § 1546(a) was first enacted as part of the Immigration Act of 1924 ("1924 Act"). Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153. The relevant provision fell within the section entitled "Offenses in connection with documents" and originally stated: "Whoever knowingly makes under oath any false statement in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, shall, upon conviction thereof, be fined . . . or imprisoned . . . , or both." 1924 Act § 22(c). Our focus is on the term "application," and how that word, as used by Congress, is best construed.

Start with ordinary usage. As commonly understood during that time, "application" meant making a request. *See*

---

[11] Prior decisions interpreting § 1546(a) provide little help. While we considered the meaning of § 1546(a) in *United States v. Ashurov*, our review was limited to the presentment clause. 726 F.3d 395 (3d Cir. 2013). The Ninth Circuit's decision in *United States v. Chu* addressed what constitutes an "oath" in the context of § 1546(a), but it did not address whether § 1546(a) extends to oral statements. 5 F.3d 1244 (9th Cir. 1993). The First Circuit construed § 1546(a) to apply only where "the statement was made in an application required by the United States immigration laws and regulations." *United States v. Boskic*, 545 F.3d 69, 85 (1st Cir. 2008). But it did not explain its conclusion that § 1546(a) applied to statements in the required immigration document, but not statements about those documents.

*Application*, Black's Law Dictionary 78 (2d ed. 1910) ("A putting to, placing before, preferring a request or petition to or before a person. The act of making a request for something."); H.W. Fowler & F.G. Fowler, The Concise Oxford Dictionary of Current English 39 (7th ed. 1919) (defining "application" as the "making of a request"); Noah Webster, An American Dictionary of the English Language 45 (New York, White & Sheffield 1841) (defining "application" as "[t]he act of making request, or soliciting"). While "application" standing alone, in 1924 as now, could refer to an oral request, "[w]idening our view to take in" the entire statutory context shows that Congress meant a written submission. *Henson v. Santander Consumer USA Inc.,* 137 S. Ct. 1718, 1722 (2017).

First, the 1924 Act places "application" in a three-item series: "application, affidavit, or other document." 1924 Act § 22(c). Congress's use of the phrase "or other document" then modifies both "application" and "affidavit" to make them similar in scope, as "[w]ords in a list are generally known by the company they keep." *Logan v. United States*, 552 U.S. 23, 31 (2007). As limited, "application" thus refers to a request submitted in the form of a document. *Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). So while "application" might have a "much more expansive sense, that isn't how the term was ordinarily used at the time." *Wis. Cent.*, 138 S. Ct. at 2072 (emphasis omitted).[12]

---

[12] Cases from the period construing "application" in other contexts apply the same meaning. *See*, *e.g.*, *N. Assurance Co. of London v. Grand View Bldg. Ass'n*, 183 U.S. 308, 359

Second, the section heading of the 1924 Act adds clarity, because while "heading[s] cannot substitute for the operative text of the statute[,]" they are surely "tools available for the resolution of doubt about the meaning of a statute." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (internal quotation marks and citation omitted). Congress opted to place the prohibition on "any false statement in any application" inside a section titled "Offenses in Connection with Documents," strong evidence that "application" referred to a written request or submission. *See* 1924 Act § 22.

---

(1902) ("[H]ere the right is asserted to prove, not only that the assured did not make the statements contained in his answers, but that he never read the application[.]") (quoting *N.Y. Life Ins. Co. v. Fletcher*, 117 U.S. 519, 529 (1886)); *United States v. Poinier*, 140 U.S. 160, 162 (1891) ("It would seem from this [context] that the 'applications' were presumed to be in writing[.]"); *Rushing v. Manhattan Life Ins. Co. of N.Y.*, 224 F. 74, 75 (8th Cir. 1915) (referring to an application for a life insurance policy as a "written application"); *U.S. Fid. & Guar. Co. v. Egg Shippers' Strawboard & Filler Co.*, 148 F. 353, 357 (8th Cir. 1906) ("It is altogether clear that the written statement which the defendant failed to attach to or indorse on the bond is an application or representation within the meaning of the Iowa statute."); *Carrollton Furniture Mfg. Co. v. Am. Credit Indemn. Co. of N.Y.*, 124 F. 25, 30 (2d Cir. 1903) ("In this case . . . there was an untrue statement in the application signed by the insured[.]").

17

Next, we "extend[] our gaze from the narrow statutory provision at issue to take in the larger statutory landscape[.]" *Henson,* 137 S. Ct. at 1722. Preceding sections of a statute "are integral parts of a whole" and "define the field in which Congress was legislating[.]" *New Prime*, 139 S. Ct. at 538. Helpfully, Congress's reference to an "application" in Section 22(c) was not its only use of that term in the 1924 Act. Take Section 7(a), requiring that "[e]very immigrant applying for an immigration visa shall make application therefor in duplicate in such form as shall be by regulations prescribed." 1924 Act § 7(a). None would read a directive to submit duplicate applications to mean anything besides written forms. Or consider Section 7(f), explaining that "[e]ach copy of the application shall be signed by the immigrant in the presence of the consular officer and verified by the oath of the immigrant administered by the consular officer." 1924 Act § 7(f). And, by cross-reference, including a false statement in a document required under Section 7(f) subjected an affiant to prosecution under Section 22(c).[13] So we follow the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). That means Congress used the term "application" consistently to mean a written instrument throughout the 1924 Act.

---

[13] Recall that Section 22(c), later codified as 18 U.S.C. § 1546(a), provided "[w]hoever knowingly makes under oath any false statement in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, shall, upon conviction thereof, be fined . . . or imprisoned . . . , or both." 1924 Act § 22(c).

Finally, "contemporaneous usages, customs, and practices" during the era "shed light on the meaning of the language in question at the time of enactment." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2468 (2020); *see also* Oliver Wendell Holmes, The Theory of Legal Interpretation, 12 Harv. L. Rev. 417, 417–18 (1899) (describing interpretation as asking "what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used," and noting that "it is to the end of answering this last question that we let in evidence as to what the circumstances were"). Under the 1924 Act, immigrants seeking entry into the United States first obtained a visa by applying to an American consulate abroad. 1924 Act §§ 2, 7; *see generally* Abram Orlow, Manual on the Immigration Laws of the United States 44–45 (B'nai B'rith, 2d ed. 1948) (describing the documentation required to prepare visa petitions). "The formal application [was] filled out only when the [individual] present[ed] himself with his documents and evidence." Sidney Kansas, U.S. Immigration Exclusion and Deportation and Citizenship of the United States of America 21 (2d ed. 1940). Then, "[e]ach copy of the application" was "signed by the immigrant in the presence of the consular officer and verified by the oath of the immigrant administered by the consular officer." 1924 Act § 7(f). And a fee covered "the furnishing and verification of each application, which . . . include[d] the furnishing and verification of the duplicate." *Id.* § 7(h). Throughout, the focus of the visa process was the information in the application, supported by accompanying documentation. That ended with a "preexamination . . . conducted in the first instance by an immigrant inspector" who "shall prepare in duplicate Form I-448, 'Manifest Data,' which together with the application for preexamination, medical certificate, documents required in § 142.9, and other pertinent

documents presented, shall constitute the record in the case." 8 C.F.R. § 142.11 (1941). And it was a false statement *within* that "application, affidavit, or other [required] document" that could trigger criminal penalty. *See, e.g.*, *United States ex rel. Fink v. Reimer*, 16 F. Supp. 487 (S.D.N.Y. 1936), *aff'd*, 96 F.2d 217 (2d Cir. 1938) (Hand, J.) (obtaining a visa as a result of a false statement that misrepresented the applicant's identity violated Section 22(c)); *see also* Kansas, *supra*, at 65 (describing Section 22 as addressing "forged, false, or altered documents").

Taken together, the best reading of "application" in the 1924 Act means only written statements submitted in document form. With that meaning in mind, we turn to Congress's subsequent statutory language that builds on the 1924 Act.[14]

2.    The Immigration and Nationality Act of 1952

Congress updated Section 1546(a) in the Immigration and Nationality Act of 1952 ("1952 Act Amendment"). Pub. L. No. 82-414, Title IV, § 402, 66 Stat. 163, 275–76. Among other changes, it amended the fourth paragraph of § 1546(a) to apply to "[w]hoever knowingly makes under oath any false statement *with respect to a material fact* in any application,

---

[14] In 1948, Congress codified the criminal law of the United States into a single part of the United States Code, Title 18. As a result, Section 22(c) of the 1924 Act moved to the fourth paragraph of 18 U.S.C. § 1546(a) without change, and with a new name, "Fraud and Misuse of Visas and Permits." *See* Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 771–72 (1948).

20

affidavit, or other document required by the immigration laws." *Id*. (emphasis added to text inserted by amendment).

The parties agree that, at a minimum, the 1952 Act Amendment limited prosecutions under § 1546(a) to only *material* false statements, rather than prosecution for *any* passing falsity. But does it do more? The Government says yes, and reads the phrase "with respect to" as covering *all* false material statements whether "made orally, regarding the written application, as well as in writing." (Response Br. at 22.) Jabateh posits that Congress added "with respect to a material fact" only to "clarify that the false statement, to be prosecutable, must be material" and not "to have [the] substantive broadening effect" of extending § 1546(a) to oral statements. (Opening Br. at 28.) As with the 1924 Act, our answer turns on the best reading of "the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) (explaining that under the whole-text canon "[i]t is the most natural and genuine exposition of a statute to construe one part of the statute by another part of the same statute").

First, consider Section 287 of the 1952 Act granting certain select immigration officers the authority to administer oaths. It also added that "any person to whom such oath has been administered . . . who shall knowingly or willfully give false evidence or swear to any false statement concerning any matter referred to in this subsection shall be guilty of perjury" under 18 U.S.C. § 1621. 1952 Act § 287(b).[15] Section 1621 is

---

[15] This provision is codified at 8 U.S.C. § 1357(b), and has remained essentially unchanged since the 1952 Act.

21

the general perjury statute applicable not just to immigration proceedings, but "in any case in which a law of the United States authorizes an oath to be administered[.]" 18 U.S.C. § 1621(1). So false statements made under oath to immigration officers, including oral statements, may be subject to prosecution for perjury. And there was little point to Congress adding that authority if, as the Government contends, oral misstatements were already prohibited under § 1546(a). To the contrary, "[w]e usually 'presume differences in language like this convey differences in meaning.'" *Wis. Cent.*, 138 S. Ct. at 2071 (quoting *Henson,* 137 S. Ct. at 1723). "And that presumption must bear particular strength when the same Congress passed both statutes to handle much the same task." *Id*. at 2071–72. Following that interpretive path, the best reading of 1952 Act Amendment is that material, false statements made under oath are chargeable under § 1546(a) only if made in a document, while oral statements about those same documents are chargeable as perjury under § 1621. Indeed, "[m]ore confirmation yet comes from a neighboring term in the statutory text." *New Prime*, 139 S. Ct. at 540. Because looking directly to § 1621 shows that Congress knew how to make a criminal statute applicable to both oral and written statements.[16]

---

[16] This was equally true of the version of 18 U.S.C. § 1621 before the 1952 Act:

> Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he

Confirmation comes also from the amended section heading of the 1952 Act, renamed with an eye toward documents: "Fraud and misuse of visas, permits, and other entry documents." 1952 Act § 402. *See Fla. Dep't of Revenue*, 554 U.S. at 47. This amendment demonstrates Congress's chosen language focuses on documents, and not oral statements. *See Bedroc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there.") (internal quotation marks and citation omitted).

Short of re-writing Congress's work, § 1546(a) is not naturally read to apply to oral statements. Indeed, any other reading, including the broad interpretation posited by the Government, is "unmoor[ed]" from the text and "opens the door to a world of disquieting consequences—which we would need far stronger textual support to believe Congress intended." *Maslenjak v. United States*, 137 S. Ct. 1918, 1927 (2017).

---

will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury[.]

Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 773–74 (1948).

3.    The 1976 Amendment and Statements Made "Under Penalty of Perjury"

The Government offers an alternative argument that requires still more history. Recall that before 1976 the language of § 1546(a) applied only to false statements made "under oath" because, at that time, administrative necessity required applicants to appear in person to sign documents under oath.[17] In 1976, Congress again amended § 1546(a) to add an option to sign documents "under penalty of perjury." Pub. L. No. 94-550, 90 Stat. 2534, 2535 (1976) ("1976 Amendment"). The 1976 Amendment changed § 1546(a) "by inserting immediately after 'under oath' the following: ', or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true[.]'" *Id.* This, the Government argues, served to "make clear that the offense extends to [an oral] false statement under oath as well as in writing." (Response Br. at 23.)

Clear it is not. For one thing, new language added to a statute ordinarily ought not be read to alter the meaning of the statute's existing and unchanged text. Scalia & Garner, *supra* at 78 (explaining that under the fixed-meaning canon "[w]ords must be given the meaning they had when the text was adopted").[18] "After all, if judges could freely invest old

---

[17] *See, e.g.*, Kansas, *supra*, at 21 ("The formal application is filled out only when the alien presents himself [to the Consulate] with his documents and evidence.").

[18] The Government suggests that we look to legislative history for support (Govt. Supp. Br. at 15–16), but doing so "would risk failing to take account of legislative compromises essential to the law's passage and, in that way, thwart rather

24

statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." *New Prime*, 139 S. Ct. at 539 (internal quotation marks and citation omitted). So while the 1976 Amendment added a new, alternative method for attestation, nothing suggests that we are free to change the ordinary understanding of the untouched portion of the text.

The Government responds to all of this with necessity, urging an atextual reading of § 1546(a) that reaches oral statements because to hold otherwise "would permit a defendant to escape Section 1546(a) culpability for lying under oath to immigration officials about the contents of required immigration documents," which the Government characterizes as a "perverted result" that "should be avoided." (Response Br. at 21.) That plea deserves a response.

First, "[i]t is not our role to second-guess Congress' decision," or reimagine its words as we think appropriate. *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019). Lest we forget, "[t]he place to make new legislation, or address unwanted consequences of old legislation, lies in Congress." *Bostock*, 140 S. Ct. at 1753. And that is for reasons as old as our nation: "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes[.]" *Wis. Cent.*, 138 S. Ct. at 2074. Second, the

---

than honor the effectuation of congressional intent." *New Prime*, 139 S. Ct. at 543 (internal quotation marks and alterations omitted). So we "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

Government asks for an interpretation of § 1546(a) so novel that it concedes it is aware of *no* decision of *any* court applying the meaning it seeks. (*See* Oral Arg. Tr. at 32.) That is more likely explained by the natural reading of the statute than coincidence.

Finally, what, precisely, is "perverted" about a result that holds one branch of the Government to the limits imposed by another equal branch? Not the egregious facts of this case. None, including the jury that weighed impartially the mountain of evidence marshalled against Jabateh, would view his conduct as anything less than monstrous. But none, including the Government, can argue that glancing away from the limited authority given by the people will produce a sounder, fairer, and stronger union. To the contrary, "all powers of government, legislative, executive and judicial alike, can be abused or perverted." *Jones v. City of Opelika*, 319 U.S. 105, 137 (1943) (Frankfurter, J. dissenting). It is our job, under Article III of the Constitution, to enforce that solemn duty in cases both easy and hard, filled with facts both bland and nauseating.

For all these reasons, the text, context, and history of § 1546(a) show that the best reading of the statute applies only to material, false statements made in a document under oath or under penalty of perjury, not false statements made orally under oath about that document. *See Kansas v. Garcia*, 140 S. Ct. 791, 803 (2020) (describing the conduct outlined in § 1546 as "immigration-document fraud").[19]

---

[19] In supplemental briefing, the Government argues for the first time that even if Jabateh's conviction under § 1546(a)

26

**B.  Reviewing Jabateh's Convictions Under § 1546(a) For Plain Error**

Having reached the best ordinary reading of § 1546(a), we consider whether Jabateh's convictions under Counts One and Two may stand. Recall that Jabateh did not raise this issue before the District Court. As a result, our review is defined by Federal Rule of Criminal Procedure 52(b), and we may only reverse if the erroneous interpretation of § 1546(a) is "plain." *United States v. Payano*, 930 F.3d 186, 192 (3d Cir. 2019) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). And under well-established principles, the error here is not.

**1.  The Doctrine of Plain Error**

We ground our analysis in history. The plain error doctrine allows courts to notice and correct, at their discretion,

---

does not stand based on his oral statements, he is still "'punishable as a principal' under 18 U.S.C. § 2(b)" because he "caused" an immigration officer "to make the answers on his behalf on the document." (Govt. Supp. Br. at 7.) Section 2(b) provides "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). But the Supreme Court has cautioned that "[t]o uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process." *Dunn v. United States*, 442 U.S. 100, 106 (1979). Even if the evidence is clear that Jabateh caused an immigration officer to include false answers in the immigration form, as the Government now contends, it is long past the time for the Government to add charges to its indictment.

errors raised for the first time on appeal. The Supreme Court has long recognized judicial authority to address "a plain error [that] was committed in a matter so absolutely vital to defendants[.]" *Wiborg v. United States*, 163 U.S. 632, 658 (1896); *see also Clyatt v. United States*, 197 U.S. 207, 221–22 (1905). In *United States v. Atkinson*, the Supreme Court clarified that the doctrine protects the integrity of judicial proceedings where an unnoticed error threatens to "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936). Less than a decade later, Rule 52(b) codified *Atkinson*'s definition of plain error. *See* Advisory Committee Notes on Fed. R. Crim. Proc. 52; *accord Olano*, 507 U.S. at 736.

*Olano* articulated the four-prong inquiry for analyzing errors under Rule 52(b) and the plain error doctrine. Courts may provide remedies only if (1) there is an "error[,]" (2) the error is "plain[,]" and (3) the plain error "affect[s] substantial rights." *Olano*, 507 U.S. at 732–34; *see also Johnson v. United States*, 520 U.S. 461, 466–67 (1997). Meeting all three allows a court to "correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (citing *Atkinson*, 297 U.S. at 160). Still, "Rule 52(b) is permissive, not mandatory." *Id.* at 735. And the result is a high bar for reversing plain errors because a "plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard, for otherwise the discretion afforded by Rule 52(b) would be illusory." *Id.* at 736–37.

Here, our interpretation of § 1546(a) does not meet the stringent test of Rule 52(b) because, applying our prior

decisions, the issue is not sufficiently "plain" to warrant reversal.

2. Defining What Errors are "Plain" Under Rule 52(b)

The term "'[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Id.* at 734 (citations omitted). While courts sometimes speak of statutes as either "clear" or "ambiguous," the fault lines among possible meanings are rarely so sharp. That is why, whatever the label, "'a reviewing court employs all of the traditional tools of construction'" to "'reach a conclusion about the best interpretation,' thereby resolving any perceived ambiguity." *Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2448 (2019) (Kavanaugh, J., concurring in judgment)). While that task is not difficult, the process of interpretation may require more or less rummaging in the "toolbox" to "seiz[e] everything from which aid can be derived[.]" *Ocasio v. United States*, 136 S. Ct. 1423, 1434 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998)). And the deeper that interpretive inquiry, the less obvious, at least at the outset, the answer.

It is generally true that "lack of precedent alone will not prevent us from finding plain error." *United States v. Stinson*, 734 F.3d 180, 184 (3d Cir. 2013); *see, e.g.*, *United States v. Benjamin*, 711 F.3d 371, 379 (3d Cir. 2013) ("Although the continuing nature of the conduct criminalized by the . . . statute is a matter of first impression for this Court, we hold that the District Court's error was plain."); *see also United States v. Seals*, 813 F.3d 1038, 1047 (7th Cir. 2016) ("[T]he fact that this court rarely finds plain error in [matters of first impression]

does not mean that such a conclusion is never warranted.") (internal quotation marks omitted). But for relief under the stringent *Olano* standard, novel questions still must be capable of measurement against "some other 'absolutely clear' legal norm[.]" *United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011); *see also Henderson v. United States*, 568 U.S. 266, 275 (2013) ("*[W]hether* the law of [a] circuit initially was unclear . . . . [is] likely to be particularly difficult to resolve where what is at issue is a matter of legal degree, not kind."); *Gov't of the V.I. v. Vanterpool*, 767 F.3d 157, 163 (3d Cir. 2014); *United States v. Seighman*, 966 F.3d 237, 244 (3d Cir. 2020).

### 3. Jabateh's Novel Argument does not Produce Plain Error

Taken together, the novel question of whether § 1546(a) is best read to include oral statements is not an interpretative exercise that falls within the exacting limits of Federal Rule of Criminal Procedure 52(b). First, it cannot be said that the meaning of § 1546(a) was "clear" as we normally understand clarity in legal interpretation, for the meaning of § 1546(a) was unsettled both at Jabateh's trial and throughout this appeal. *Henderson*, 568 U.S. at 275; *see also United States v. Terrell*, 696 F.3d 1257, 1260 (D.C. Cir. 2012) (noting that, in plain error review, "'plain' simply means 'clear'") (citation omitted). Second, as all parties agree, there is no instance of any other court considering the ordinary meaning of § 1546(a). *Vanterpool,* 767 F.3d at 163. Nor is there any controlling or persuasively clear "legal norm" on the meaning of the provision. *Stinson*, 734 F.3d at 184; *Nwoye*, 663 F.3d at 466.

At bottom, Jabateh's challenge presents a new issue of interpretation, where only a close interpretative inquiry reveals the best reading of § 1546(a). That, under controlling decisions

30

of Federal Rule 52(b), is not a clear, plain error. We do not doubt that "[f]ew constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused." *Dunn v. United States*, 442 U.S. 100, 106 (1979). But the limits on our review prescribed by the Supreme Court in Rule 52(b) under the authority provided by Congress in the Rules Enabling Act, 28 U.S.C. § 2072, bind our review. As a result, we cannot disturb Jabateh's conviction.[20]

## C.     Ample Evidence Supports Jabateh's Convictions Under 18 U.S.C. § 1621

Jabateh argues that his perjury convictions should also be reversed because the evidence submitted at trial failed to prove a false statement. Again, as Jabateh failed to move for a judgment of acquittal based on the insufficiency of the evidence, we review his claim for plain error. *United States v. Gordon*, 290 F.3d 539, 547 (3d Cir. 2002). We thus "review the argument only for a manifest miscarriage of justice—the record must be devoid of evidence of guilt or the evidence must be so tenuous that a conviction is shocking." *United States v. Burnett*, 773 F.3d 122, 135 (3d Cir. 2014) (internal quotation marks and citation omitted). "Such an error requires a

---

[20] Jabateh asks this Court to employ the "rule of lenity" to find in his favor "if there were some doubt about the meaning" of § 1546. (Opening Br. at 29.) Having arrived at the best ordinary meaning of the statute, we find that the rule of lenity has no application here. *See United States v. Johnman*, 948 F.3d 612, 620 (3d Cir. 2020) (holding that the rule of lenity "may be applied only where we are left with 'grievous ambiguity' after applying all other traditional tools of statutory interpretation") (citation omitted).

defendant to establish that the trial judge and prosecutor were derelict in even permitting the jury to deliberate." *Id*. So "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Counts Three and Four charged Jabateh with perjury in violation of 18 U.S.C. § 1621(1). As usual, the text governs. Section 1621(1) provides that an individual is guilty of perjury if, after "tak[ing] an oath before a competent tribunal [or] officer . . . that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true," the individual "willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true[.]" 18 U.S.C. § 1621(1). Distilled to its elements, the Government must show that Jabateh 1) willfully 2) made a false statement 3) under oath 4) before a tribunal or officer 5) about a material matter. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993). The record shows that the Government amply carried its burden.

1.      Count Three

Form I-485, Application to Register Permanent Resident or Adjust Status, asked Jabateh whether he had "ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion[.]" (App. at 84.) Jabateh responded "No" on the form. (App. at 84.) Count Three charged that Jabateh committed perjury in violation of 18 U.S.C. § 1621 during his 2011 Interview when, under oath, he falsely affirmed the truth of this response.

32

Jabateh argues that the Government never established that these killings occurred "because of race, religion, nationality, ethnic origin or political opinion." (Opening Br. at 30–31.) The evidence presented tells a different story.

To start, witnesses recounted in graphic detail the rampant violence perpetrated by Jabateh, personally or under his orders, for factional political affiliation. Hawa Gonoie testified that at just thirteen years old she witnessed Jabateh order his men to kill and mutilate a suspected spy. Janghai Barclay testified that she watched Jabateh declare a captured young man a traitor with no more than a glance and order his execution. Kafumba Konneh testified that he watched Jabateh order executions of suspected spies and NPFL prisoners of war more than once.

Or take the evidence that Jabateh and his fighters targeted victims solely based on ethnic and religious differences. After the ULIMO split along tribal lines, with Mandingo fighters forming ULIMO-K and Krahn fighters forming ULIMO-J, Jabateh and his ULIMO-K fighters targeted, tortured, and killed members of the Krahn tribe. Martha Togba testified that she observed Mandingo ULIMO-K fighters disarming non-Mandingo fighters at Zero Guard Post while chanting and wearing headbands proclaiming "No more Jesus, only Allah." (App. at 450.) A few days later, Jabateh brutally beat, shot, stabbed, and killed Ms. Togba's pregnant sister, Tina, and left her body in the street to rot; all because she was in a relationship with a Krahn ULIMO-J commander.

Candidly, Jabateh does not deny his role in these atrocities. Instead, he argues his actions resulted from "a general atmosphere of cruelty and violence in the context of a

33

civil war seemingly waged without rules or restraint." (Opening Br. at 31.) Even if "there were no clean hands" in the Liberian civil war (App. at 619), and even if multiple factions committed religiously, ethnically or politically motivated violence, they are of no possible relevance to Jabateh's convictions. There was sufficient evidence presented for a rational trier of fact to have found that Jabateh committed perjury.

> 2.      Jabateh Gained Immigration Benefits by Fraud or Willful Misrepresentation

Remember that during the 2011 Interview immigration officials asked Jabateh whether he had, "by fraud or willful misrepresentation of material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any immigration benefit," a question identical to that shown on his Form I-485. (App. at 84, 637.) Jabateh orally reaffirmed that his response was "no." That, says the Government in Count Four of the indictment, is perjury in violation of § 1621 because Jabateh gained asylum by lying in his Asylum Application and again during 1999 Interview. That is correct.

Begin with Jabateh's submissions in support of his application for asylum. In his attached personal statement, Jabateh stated that between 1992 and 1995 he served as an "intelligence officer" and later as a "security section liaison" with the ULIMO. (App. at 144–45.) The evidence shows otherwise, with several witnesses testifying that Jabateh never served in security, but as a commander and an active combatant in the ULIMO-K.

Jabateh argues that his "inadequately detailed personal statement" was "[b]ut a simple failure to volunteer additional

34

information" and insufficient to establish fraud or willful misrepresentation. (Opening Br. at 34–35.) But this is no simple oversight or innocuous omission. He not only failed to disclose his role as a combatant, he affirmatively misrepresented the scope of that role. Jabateh painted himself as a peaceful figure that actively "protect[ed] Mandingo and Krahn people from being murdered and massacred" and assisted with United Nations and ECOMOG disarmament efforts. (App. at 144–45.) The testimony of seventeen witnesses to his violence brought forth the truth. These misrepresentations no doubt led Jabateh to be granted asylum. Nancy Vanlue, the asylum officer who conducted the 1999 Interview, testified that, had she known Jabateh misrepresented his positions in ULIMO, he would have been barred from obtaining asylum as a persecutor.

And Jabateh's misrepresentations did not end with his asylum application and personal statement. In the 1999 Interview, he denied having "ever committed a crime" or even "harm[ing] anyone else." (App. at 74, 166, 570–71.) Jabateh now claims on appeal that these questions "are too vague and ambiguous to support a conviction." (Opening Br. at 37 (quoting App. at 74).) Yet "[c]hallenges to the clarity of a question" that arise in perjury cases, such as the challenge raised by Jabateh, "are typically left to the jury, which has the responsibility of determining whether the defendant understood the question to be confusing or subject to many interpretations." *United States v. Hird*, 913 F.3d 332, 346 (3d Cir. 2019). That means we "will not disturb a jury's determination that a response under oath constitutes perjury unless it is entirely unreasonable to expect that the defendant understood the question posed to him." *Id.* (internal quotation marks and citation omitted). Instead, we are "focused on

35

glaring instances of vagueness or double-speak by the examiner at the time of questioning (rather than artful post-hoc interpretations of the questions) that—by the lights of any reasonable fact-finder—would mislead or confuse a witness into making a response that later becomes the basis of a perjury conviction." *Id*. at 347–48.

That standard makes quick work of this claim. For it was not "entirely unreasonable" for the jury to have expected Jabateh to have understood these simple questions. *Id.* at 346. Vanlue's testimony, for example, shows that Jabateh understood what it means to commit a crime or cause harm. Vanlue recalled that during his asylum interview Jabateh described being beaten, and his wife raped, because of his Mandingo tribal affiliation. Gallingly, he cited these acts as the basis for his asylum claim. The jury could conclude Jabateh knew right from wrong. Likewise, as already painfully recounted, the evidence presented at trial was sufficient for a rational finding that Jabateh's entire military career was defined by violent crime.

Logically, there was sufficient evidence for the jury to find that Jabateh gained asylum by lying about his crimes. And from there it is a small step to conclude that Jabateh perjured himself during his 2011 Interview by affirming under oath statements "which he d[id] not believe to be true." 18 U.S.C. § 1621(1). For all those reasons, we find no plain error in Jabateh's conviction under Count Four.

**D.** **The District Court was Not Required to Merge Jabateh's Immigration Fraud and Perjury Convictions**

For the first time on appeal, Jabateh argues that Counts One and Three charged the "same offense." Likewise, Counts Two and Four. We disagree. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses[,] or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *see also United States v. Miller*, 527 F.3d 54, 71 (3d Cir. 2008) (applying *Blockburger*'s "same-elements" test).

To prove a violation of § 1546(a), the Government needed to show that Jabateh 1) "knowingly" 2) "under oath" 3) made "any false statement" 4) "with respect to a material fact" 5) in a "document required by the immigration laws or regulations." 18 U.S.C. § 1546(a). By contrast, to prove a violation of § 1621(1), the Government needed to establish that Jabateh 1) "willfully" 2) made a false statement 3) under oath 4) before a tribunal or officer 5) about "any material matter." 18 U.S.C. § 1621(1).

Comparing these two statutes reveals at least two key differences. First, § 1546(a) requires proof that the "false statement" was in a "document required by the immigration laws or regulations." Section 1621(1) contains no such element. Second, § 1546(a) and § 1621(1) require different states of mind. Section 1546(a) requires proof of a "knowingly" false statement, while § 1621(1) requires proof the defendant acted "willfully." *Cf. United States v. Sherman*, 150 F.3d 306, 311 (3d Cir. 1998) (describing "knowingly" as

37

"a reduced mens rea" as compared to "willfully") (emphasis omitted); *United States v. Gross*, 511 F.2d 910, 914–15 (3d Cir. 1975) ("Congress chose to provide different mens rea elements: Unlike the general perjury statute, § 1623 requires that a false statement be made 'knowingly,' rather than 'willfully.'"). As each statute requires the Government to establish at least one element that is not required by the other statute, there is no plain error in declining to merge the counts.

### E. Jabateh's Consecutive Sentence is not Plain Error

Jabateh challenges his thirty-year aggregate sentence, arguing that the District Court's 26-level departure and imposition of the maximum sentence on each count running consecutively was procedurally unreasonable. Once again, as Jabateh failed to raise his objections before the District Court, we review the procedural reasonableness of his sentence for plain error.[21] *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 764 (2020) ("Errors 'not brought to the court's attention' . . . are subject to review only insofar as they are 'plain.'") (quoting Fed. R. Crim. Proc. 52(b)). He does not meet that rigorous test.

We have explained that "District Courts engage in a three step process when imposing a sentence, the first being that the defendant's guideline range is calculated." *United States v. Stevenson*, 832 F.3d 412, 431 (3d Cir. 2016) (internal

---

[21] Although Jabateh first argued we review his sentence for an abuse of discretion (Opening Br. at 46), he conceded at oral argument that he was "up against plain error" (Oral Arg. Tr. at 52). We agree with that revised position, as Jabateh has not pointed to where he objected to an above-Guidelines sentence. Nor can we locate any objection in the record.

quotation marks and citation omitted). And "[t]he [District] Court [is] required to make this determination before moving on to consider any departure motions (step two) and the § 3553(a) factors (step three)[.]" *Id.* Jabateh argues that the District Court committed procedural errors by 1) imposing an unjustified upward departure; 2) imposing consecutive sentences; and 3) basing Jabateh's sentence on a material misapprehension of fact.

1.     The District Court's Upward Departure or Variance

The District Court departed 26 levels to impose a total sentence of 360 months, comprising consecutively-running sentences of 120 months' imprisonment on each of Counts One and Two (violations of § 1546(a)) and sixty months' imprisonment on each of Counts Three and Four (violations of § 1621).[22] That represented the statutory maximum for each count of conviction. The District Court based its sentence on two alternative grounds: 1) "an upward departure because of the seriousness of [Jabateh's] immigration offenses, pursuant

---

[22] Jabateh does not challenge the District Court's initial calculation of the advisory Guideline range of fifteen months' to twenty-one months' imprisonment. Rather, he challenges the 26-level upward departure, which led to an adjusted Guidelines range of 292 to 365 months' imprisonment. (App. at 11.) The District Court then imposed the combined statutory maximum of 360 months for all four counts. (App. at 11.) *See* 18 U.S.C. § 1546(a) (statutory maximum of ten years for the first and second offense under this section); 18 U.S.C. § 1621 (statutory maximum of five years).

39

to Guidelines § 5K2.0"; and 2) "an upward variance from the Guidelines, pursuant to 18 U.S.C. § 3553[.]" (App. at 26–27.)

Under § 5K2.0, a "sentencing court may depart from the applicable guideline range if . . . the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance[.]" U.S.S.G. § 5K2.0(a)(1). The District Court calculated the initial Guidelines range using the 2010 Sentencing Guidelines, which did "not take into consideration the significant aggravating circumstances—the serious human rights offenses—the defendant concealed when he committed the instant offense[s]." (PSR ¶ 108.)

As the District Court's exhaustive sentencing memorandum explained, Jabateh's "criminal actions f[e]ll well outside the heartland of all Guidelines provisions related to immigration fraud and perjury." (App. at 35; *see also* PSR ¶¶ 108, 110 (observing that "[a]fter considering the history and characteristics of the defendant, the Court may consider a sentence outside the advisory guideline system").) Although the District Court addressed and considered Jabateh's conduct in Liberia, the sentence was ultimately based on the seriousness of his lies and their effect on the asylum and immigration process. As to Jabateh's immigration fraud, the District Court reasoned that "[i]n lying to INS about his crimes and seeking sanctuary as a persecuted refugee, [Jabateh] stood the persecutor bar and, indeed, the asylum system itself, on its head." (App. at 33.) And as to perjury, the District Court emphasized that the "heartland of Guidelines § 2J1.3 is far removed from the kind of perjury [Jabateh] committed here: perjury that undermines the foundations of our immigration and asylum system." (App. at 35.)

40

These conclusions are neither irrational nor novel. To the contrary, they mirror decisions in similar cases imposing statutory maximum sentences for similar offenses. *See, e.g.*, *United States v. Munyenyezi,* 781 F.3d 532 (1st Cir. 2015) (affirming concurrent, statutory-maximum sentences for immigration fraud convictions arising from defendant's concealment of her role in the Rwandan genocide); *United States v. Worku*, 800 F.3d 1195 (10th Cir. 2015) (affirming significant upward departure and 22-year sentence for immigration fraud conviction arising from concealment of defendant's human rights abuses in Ethiopia). For those reasons, there is no plain error. The Court's sentencing memorandum leaves no doubt that its rationale for Jabateh's substantive sentence, and for running the sentences consecutively, are the same. *United States v. Cochrane*, 702 F.3d 334, 346 (6th Cir. 2012).

## 2.     The Imposition of Consecutive Sentences

"Judges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to [the] sentences that they impose[.]" *Setser v. United States*, 566 U.S. 231, 236 (2012); *accord United States v. Payano*, 930 F.3d 186, 194 n.7 (3d Cir. 2019). To exercise this discretion, a district court, "in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)." 18 U.S.C. § 3584. Here, the District Court appropriately weighed the factors set forth in 18 U.S.C. § 3553(a).

While the Guidelines advise that "[a]ll counts involving substantially the same harm shall be grouped together,"

41

U.S.S.G. § 3D1.2, they readily acknowledge a district court's authority to impose concurrent or consecutive sentences, U.S.S.G. §§ 5G1.2(d), 5G1.3(b). "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d). This was case here. Consecutive sentences implemented the District Court's adjusted Guidelines range of 292 to 365 months' imprisonment, reduced to the statutory maximum of 360 months. Given the latitude afforded to sentencing courts to select concurrent or consecutive sentences, and the Guidelines' directive that sentences "shall run consecutively to produce a combined sentence equal to the total punishment," U.S.S.G. § 5G1.2(d), the sentences here are not plainly erroneous.

### 3. The Sentence was Not Based on a Material Misapprehension of Fact

Finally, Jabateh argues that his sentence must be vacated because the District Court stated Jabateh had committed or participated in genocide.[23] But the Court did not

---

[23] A defendant is guilty of "genocide" when,

> with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group . . . (1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar

justify the sentence based on the possible legal significance of Jabateh's actions. Rather, the sentence stemmed from "the egregiousness of [Jabateh's] lies and their effect on our immigration system," and the fact that the "lies allowed [him] to impugn the integrity of our asylum process for almost twenty years." (App. at 38.) Over and over, the District Court explained its decision hinged on the gravity of Jabateh's *concealment* of his "commission of every conceivable war crime" and "countless human rights offenses." (App. at 32; App. at 28 ("I thus imposed an upward departure because of the seriousness of Defendant's lies, *separate and apart* from the horror of the crimes themselves.") (emphasis added).) So there is no plain error in considering Jabateh's participation in genocidal acts, among the multitude of human rights atrocities established in the record, to fashion a reasonable sentence.[24]

---

techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force the children of the group to another group[.]

18 U.S.C. § 1091(a).

[24] Even assuming the District Court considered Jabateh's role in genocide, there would be no misapprehension of fact constituting plain error. (*See* App. at 14–24, 26, 32 (noting efforts to "eliminate Krahn rivals"), 1391–93, 1394 ("The trial has overwhelmingly showed that the defendant committed these acts purely, purely because of ethnic enmity, political enmity, or religious enmity.").) Jabateh's denials of

### III. Conclusion

For the above reasons, we will affirm Jabateh's conviction and sentence.

---

his role in both genocide and "the killing of any person because of race, religion, nationality, ethnic origin or political opinion" were gravely false. (App. at 75.)